TERRI F. LOVE, Judge.
_JjThis appeal arises from defendant’s conviction of attempted second degree robbery. The defendant was sentenced to six years at hard labor, with credit for time served. The issues raised on appeal include: (1) whether the trial court abused its discretion by denying the defendant’s motion to suppress the out-of-court identification; (2) whether there was sufficient evidence to support the conviction and sentence; and (3) whether the defendant received ineffective assistance of counsel. We find that the trial court did not abuse its discretion by denying the motion to suppress the out-of-court identification, because the identification was reliable. Additionally, when viewed in a light favorable to the prosecution, the evidence was sufficient to convince a rational trier of fact that the defendant intended to attempt to commit the crime of second degree robbery; and, the defendant received effective assistance of counsel. Therefore, we affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Dominic Buhcannon (“Mr. Buhcannon”) was charged by bill of information with second degree robbery. Mr. Buhcannon appeared for arraignment and entered a plea of not guilty. A hearing was held, following which, the trial court deferred ruling on probable cause and on Mr. Buh-cannon’s motion to suppress. The trial | ?court denied the motion to suppress and found sufficient probable cause to substantiate the lesser offense of simple robbery.
Mr. Buhcannon elected to have a trial by judge, following which, the judge found him guilty of attempted second degree robbery. Mr. Buhcannon filed a motion for a new trial and a motion for post-verdict judgment of acquittal, which were denied. Mr. Buhcannon was sentenced to six years at hard labor with credit for time served. Through counsel, Mr. Buhcannon moved for appeal, and defense counsel filed a written motion for appeal. Additionally, Mr. Buhcannon filed two motions to file a supplemental pro se brief which this court granted on two separate occasions. Thereafter, the defendant filed a supplemental pro se brief. Through counsel, Mr. Buhcannon contends the trial court erred in denying his motion to suppress identification. Likewise, Mr. Buh-cannon urges in his pro se brief two assignments of error including claims that the evidence was insufficient to support his conviction and that he received ineffective assistance of counsel.
On September 18, 2008, around 2:80 p.m., Joseph Centanni (“Mr. Centanni”) was working on his house at 212 North Clark Street in New Orleans. Mr. Cen-tanni was on a step ladder working on a transom window when he saw a blue car driven by a woman passing slowly. Shortly afterwards, he walked out on his porch and saw the woman at the bottom of his stairs on the side of his house. The woman asked to see his house. Mr. Centanni asked if she was alone and she said that she was by herself. Mr. Centanni let her in and once inside she asked if he had a bathroom. The woman looked at the bathroom, and then asked Mr. Centanni if he had any work for her to do. Mr. Centanni told her no and they walked outside to the porch.
[ .¡When Mr. Centanni walked outside on the porch he saw a man sitting on his stairs. The woman told Mr. Centanni that he wanted to use the bathroom. Mr. Cen-tanni reluctantly let the man into his house so that he could use the bathroom. Mr. Centanni indicated that it was time to go after he noticed the man was in the bathroom for some time. The man walked out of the bathroom and into the doorway in *315 front of Mr. Centanni. The woman was seated on the chair behind Mr. Centanni. The woman then asked Mr. Centanni if this was “a black and white thing?” Mr. Centanni turned back to face the woman to respond to her and the man hit him from behind. Mr. Centanni fell to the ground. The man rolled him to the front of the house. The man started kicking him and jammed his foot across his face. Mr. Cen-tanni noticed that the woman had a red hammer, and she hit him on his legs. Then man grabbed Mr. Centanni’s wallet, and he and the woman left. Mr. Centanni was left in a daze and was not able to see the man and woman leave.
After Mr. Centanni regained his composure, he drove around and stopped a police officer who followed him to his house. Detective Krister Villen (“Detective Villen”) along with another detective went to Mr. Centanni’s home and he described the suspects to them. Mr. Centanni described the woman as a heavy-set woman with reddish complexion and straight hair and described the man as a woman or a man dressed in black tights with cut-off jeans and wearing a black skullcap.
Detective Villen testified that he was assigned to the First District Robbery Unit, and investigated the robbery at 212 North Clark Street. Detective Villen stated when he met with Mr. Centanni he was a little shaken up and had a busted lip. Detective Villen stated Mr. Centanni described the woman as having a reddish complexion, heavy set with long straight hair and believed he described the man as ^wearing “black tights, blue jeans and a yellow bandana in his hair.” Mr. Centanni also described to Detective Villen the vehicle in which the suspects fled as a dark blue Buick Park Avenue.
Sergeant Troy Williams testified that later that day he and Lieutenant Cambiotti responded to a dispatch in an unmarked police car near Le Petit Motel. The officers observed a man dressed in female attire, wearing a yellow bandana, a blue shirt and jean shorts with tights. When the man saw the officers he discarded a hammer he had in his hand underneath the rear of a vehicle that was parked in the parking lot of Le Petit Motel.
During trial Detective Villen testified that he went to Le Petit Motel because there was a call dispatched about a black male dressed as a female chasing after another black male with a hammer. The man had on “black tight shorts, with blue jeans over it.” He also had a yellow headband in or on his hair. Detective Villen further stated the man “was a black male dressed as a female.” The man identified himself as “Charles Frazier” and agreed to do a show-up identification with the police officers.
About six hours after the robbery, Detective Villen contacted Mr. Centanni so that he could do a one-on-one identification. Sergeant Williams and Lieutenant Cambiotti drove Mr. Centanni to the Le Petit Motel and Mr. Centanni was seated in the back. The police car pulled about 20 feet away from Mr. Frazier. Detective Villen was standing six to eight feet away from Mr. Frazier and there was no one else near him. Mr. Buhcannon was the only African American man standing outside. The windows on the car were tinted, but Mr. Centanni put the window down and identified the man as the one who robbed him earlier. After Mr. Centanni identified Mr. Frazier, the police officers arrested him. During booking, |sit was determined that the man that was arrested was Dominic Buhcannon and not Charles Frazier.
At trial, Mr. Centanni testified that he wore glasses when driving and while working on houses. Mr. Centanni stated that he did not call 911 immediately after the *316 incident because he was not sure his insurance was going to cover it, but he later made an appointment to see a doctor. Mr. Centanni sought treatment with Dr. Martinez, a pain management physician, for his leg shortly after the incident. Mr. Cen-tanni also testified that he underwent microscopic surgery at the Pontchartrain Clinic and that he is currently taking Dar-vocet daily for pain as a result of the incident.
During the trial, Mr. Centanni was not able to identify Mr. Buhcannon. He stated, “If that’s him he looks completely different.” Mr. Centanni further explained that something was different about Mr. Buhcannon’s hair. Mr. Centanni stated when he first identified the man six hours had passed, but at trial he could no longer identify him.
At trial, Detective Villen was able to identify Mr. Buhcannon as the gentlemen who referred to himself as Charles Frazier on the night of the incident. Sergeant Williams was also able to identify Mr. Buh-cannon. Sergeant Williams testified that Mr. Buhcannon looked different, but his facial features were the same. Sergeant Williams also testified that Charles Frazier and Mr. Buhcannon are the same individual.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.
1 MOTION TO SUPPRESS IDENTIFICATION
In Mr. Buh'cannon’s original brief, counsel for Mr. Buhcannon asserts as the sole assignment of error that the trial court erroneously denied his motion to suppress the out-of-court identification. He contends that the identification was suggestive and was not reliable under the totality of the circumstances. A review of the record demonstrates that Mr. Buhcannon’s identification was reliable under the totality of the circumstance test. For the following reasons, we find that the trial court did not abuse its discretion by denying Mr. Buh-cannon’s motion to suppress the out-of-court identification.
In State v. Cyrus, 11-1175, pp. 9-10 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 560, this Court acknowledged the well-settled standard of review of a trial court’s ruling with respect to a motion to suppress identification, as well as the defendant’s burden:
A trial court’s determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed in the absence of an abuse of discretion. State v. Stovall, 2007-0343, p. 17 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1085.
The defendant bears the burden of proving that an out-of-court identification was suggestive and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Ballett, 98-2568, p. 17 (La.Ap. 4 Cir. 3/15/00), 756 So.2d 587, 597; State v. Martello, 98-2066, p. 8 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198. A defendant must first prove that the identification was suggestive. State v. Thibodeaux, 98-1673, pp. 20-21 (La.9/8/99), 750 So.2d 916, 932. An identification procedure is suggestive if it “unduly” focuses attention on the defendant. State v. Moore, 2010-0314, p. 8 (La.App. 4 Cir. 10/13/10), 57 So.3d 1033, 1039, writ denied, 2011-0404 (La.9/2/11), 68 So.2d 525.
In addition to suggestiveness, a defendant must prove that there was a substantial likelihood of misidentification as a result of the identification 17procedure. State v. Robinson, 2009-0922, p. 3 (La.App. 4 Cir. 3/10/10), 50 So.3d 158, 161. *317 Despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a “very substantial likelihood of irreparable misidentification.” Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 58 L.Ed.2d 140 (1977); State v. Leger, 2005-0011, p. 59 (La.7/10/06), 936 So.2d 108, 151. Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification include: 1) the witness’ opportunity to view the criminal at the time of the crime; 2) the witness’ degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.
However, a defendant must make a threshold showing that an identification is suggestive before the reliability of the identification becomes relevant. [State v. Boudreaux, 2007-0089, p. 4 (La.App. 4 Cir. 8/15/07), 966 So.2d 79, 82].
The Louisiana Supreme Court recently held that an identification procedure is suggestive if, during the procedure, the witness’s attention is unduly focused on the defendant. State v. Higgins, 03-1980, p. 19 (La.4/1/05), 898 So.2d 1219, 1233.
Mr. Buhcannon argues that the identification was suggestive in that Mr. Buhcannon was the only person shown to the victim by the police. He submits that the show-up identification was suggestive due to improper police procedures. In the instant case, police told Mr. Centanni that they had caught one of his perpetrators and had him identify Mr. Buhcannon, while the only person near him was the detective who informed him that they caught one of his perpetrators. This procedure unduly focused Mr. Centanni’s attention on Mr. Buhcannon. Thus, we find that the identification procedure was suggestive.
UEven with a finding that the identification procedure was suggestive, an application of the five Manson, supra, factors evidences that Mr. Centanni’s identification of Mr. Buhcannon was reliable.
Here, Mr. Buhcannon asserts that the identification was unreliable for the following reasons: Mr. Centanni’s description was too vague, Mr. Centanni did not claim he was certain in his identification of Mr. Buhcannon and he may have been pointing to one of the nearby officers as his assailant, and the one-on-one identification was not conducted immediately after the crime.
The first two Manson factors: the witness’s opportunity to view the criminal at the time of the crime and the witness’ degree of attention are not contested by Mr. Buhcannon. Mr. Buhcannon asserts that Mr. Centanni “apparently got a good look at his assailant.” .The robbery occurred during the day and Mr. Centanni testified that he viewed the man that attacked him for about fifteen minutes and during this time the man was inside of his home. Accordingly, the first two Manson factors are sufficiently met.
The third Manson factor examines the accuracy of the witness’s prior description of the criminal. Mr. Centanni described his assailant as a woman or a man dressed in black tights with cut-off jeans. While Mr. Centanni did not describe his assailant’s height or weight, but only his physical attire, his description matched Mr. Buhcannon’s actual appearance at the time the police first detained him. Therefore, the degree of accuracy of his prior description was not unreliable.
*318 The fourth Manson factor examines the level of certainty displayed by the witness at the confrontation. During the confrontation, Detective Villen was the closest individual standing next to Mr. Buhcannon, six feet away. Additionally, |9the other individuals were Caucasian and Mr. Buh-cannon was the only African-American man standing outside at the time Mr. Cen-tanni made his identification. Furthermore, Mr. Centanni was able to identify Mr. Buhcannon, even though he had changed clothes and was no longer wearing black tights with cut-off jeans. Thus, Mr. Centanni displayed a high level of certainty in his identification.
Finally, the fifth Manson factor examines the length of time between the crime and the confrontation. It was a six hour delay between Mr. Centanni’s original observation and his identification. While a six hour delay may not be ideal, this court recently upheld a one-on-one identification made nine hours after the crime. See State v. Green, 10-0791 (La.App. 4 Cir. 9/28/11), 84 So.3d 573. In the instant case, the one-on-one identification was done within a short period of time after Mr. Buhcannon was first detained. Here, the six hour delay between the crime and the confrontation did not cause a very substantial likelihood of irreparable misidentification.
Considering all five of the Manson factors, Mr. Buhcannon has failed to establish that Mr. Centanni’s identification of him was unreliable.

SUFFICIENCY OF THE EVIDENCE

In Mr. Buhcannon’s first pro se assignment of error, he argues that the evidence was insufficient to support his conviction.
In reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18. Using the Jackson standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the |inelements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657 (quoting State v. Captville, 448 So.2d 676, 678 (La.1984)). The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Holmes, 06-2988, p. 34 (La.12/2/08), 5 So.3d 42, 68; State v. Vessell, 450 So.2d 938, 943 (La.1984).
As previously noted, Mr. Buhcannon was found guilty of attempted second degree robbery, a violation of La. R.S. 14:64.4 which provides in pertinent part:
A. (1) Second degree robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another when the offender intentionally inflicts serious bodily injury.
(2) For purposes of this Section, “serious bodily injury” means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
With regard to attempted crimes, La. R.S. 14:27(A) provides, in pertinent part:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immate *319 rial whether, under the circumstances, he would have actually accomplished his purpose.
To convict Mr. Buhcannon of attempted second degree robbery, the State had to prove beyond a reasonable doubt that Mr. Buhcannon in this case 1) attempted to take 2) “anything of value” 3) which “belong[ed] to another from the person of another” or was “in the immediate control of another”, and 4) that he intended to “intentionally inflict[ ] serious bodily injury.” See La. R.S. 14:64.4(A)(1).
|nMr. Buhcannon argues that the evidence is insufficient because the State failed to prove beyond a reasonable doubt that Mr. Buhcannon had the specific intent to take something of value belonging to the victim, Mr. Centanni. ■ Mr. Buhcannon also argues that the State failed to meet its burden because the wallet “was taken during the course of the crime and later recovered during [the] police investigation at the Capri [M]otel in a trash can” and “it is very plausible that defendant did not attempt to take something that had been taken [already].”
With respect to intent, this Court has found that “[s]pecific criminal intent is ‘that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.’ ” State v. Pittman, 11-0741, p. 3 (La.App. 4 Cir. 2/29/12), 85 So.3d 782, 784-85, writ denied, 12-0680 (La.9/14/12), 97 So.3d 1016 (quoting La. R.S. 14:10(1)). Accordingly, “[s]pecific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant.” Id. at pp. 3-4, 85 So.3d 782 (citing State v. Hebert, 00-1052, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050).
In this case, Mr. Centanni testified that after the woman in the house asked him a question, as he turned to address her, he was hit from behind by Mr. Buh-cannon, at which time he fell to the ground, striking his shoulder. Mr. Cen-tanni further testified that Mr. Buhcannon began kicking him in the face and “stomping” him as Mr. Buhcannon rolled him over and reached for his wallet. Mr. Cen-tanni testified that he fought against Mr. Buhcannon, but that Mr. Buhcannon tore the ligaments in his arm and took his wallet.
Detective Villen similarly testified that Mr. Centanni advised him that Mr. Buh-cannon kicked him in the face and took his wallet from him. After the perpetrators fled, Mr. Centanni noticed that his phone was in pieces on the floor.
|12When Mr. Centanni’s wallet was returned to him after it was recovered pursuant to Mr. Buhcannon’s arrest, Mr. Centanni confirmed that it contained Mr. Centanni’s driver’s license, a Chase bank card, his medical cards, the death notice of his mother, and cards from business associates; however, all the money was missing, and the wallet was “to[rn] apart.”
Considering the foregoing, the State established beyond a reasonable doubt that Mr. Buhcannon intentionally attempted to take something of value that did not belong to him.
Mr. Buhcannon further alleges that the State failed to prove that he acted with specific intent to cause serious bodily injury. Specifically, Mr. Buhcannon argues that the State failed to prove that he caused Mr. Centanni’s injuries, because no medical records were introduced for Mr. Centanni, and because Mr. Centanni’s testimony was inconsistent regarding whether he was injured as a result of the robbery. Mr. Buhcannon also contends that Mr. Centanni’s injuries could have been the result of previous accidents.
*320 Mr. Buhcannon relies upon State v. Helou, 02-2302, p. 9 (La.10/23/03), 857 So.2d 1024, 1029, wherein the Louisiana Supreme Court found that the evidence presented by the State was “insufficient to sustain the defendant’s conviction for second degree battery.” In Helou, the defendant was charged with second degree battery after the defendant struck the victim’s nose with his fist, and the defendant’s friends “jumped on the victim and beat him until a bystander yelled that the police were on the way.” Id. at p. 2, 857 So.2d at 1025. The victim was transported to the hospital to treat his nose, which was bleeding. Id. A jury found the defendant guilty as charged of second degree battery, and the appellate court affirmed. Id.
113The State relied upon testimony from the victim, his wife, and an eyewitness to the incident, all of whom testified regarding the profuse amount of bleeding suffered by the victim as a result of being struck on the nose. The Supreme Court found “that the presence of blood alone does not satisfy the 'serious bodily injury’ element of second degree battery.” Id. at p. 6, 857 So.2d at 1028. The Supreme Court recognized cases wherein the State proved the “serious bodily injury” element of second degree battery,[1] as well as cases wherein the State established that less substantial injuries may nevertheless constitute “serious bodily injury.”[2] Id. at pp. 6-8, 857 So.2d at 1028-29.
114In concluding that the State failed to establish “extreme physical pain”[3] pursu *321 ant to the statute, the Court reasoned that the State offered no testimony from medical witnesses or medical records which would go to proving the pain factor. Id. at p. 8, 857 So.2d at 1029. In Helou, the only evidence presented dealt with the amount of blood the victim lost, and the State’s direct witnesses “avoided the subject of pain.” Id. The Court concluded that because the jury had to infer the victim’s pain, the State failed to prove beyond a reasonable doubt that the victim suffered extreme physical pain. Id. Thus, the evidence was insufficient to convict the defendant of second degree battery; however, the evidence was sufficient to support a conviction for simple battery. Id. at p. 9, 857 So.2d at 1029.
Here, Mr. Centanni testified that as a result of the injuries he sustained as a result of the robbery, he suffered protracted pain in his left shoulder and neck. He also testified that due to the incident his left arm was dislocated. Additionally, Mr. Centanni displayed in open court the scars from his surgery in connection with the injuries he sustained in the robbery. When asked whether “that surgery was done as a result of what happened on [the date of the incident] at North Clark Street,” Mr. Centanni replied, “I was told if I didn’t have the surgery done then that there [sic] wasn’t much they can do for me afterwards ‘cause I tried to delay it.”[4]
Further with regard to his injuries, Mr. Centanni testified that he was not rendered unconscious, but was momentarily stunned after being struck in the back of the neck. As previously noted herein, Mr. Centanni also testified that Mr. Buhcannon tore the ligaments in his arm during the struggle over Mr. Centanni’s | iswallet. As a result of the robbery, Mr. Centanni sees a physician every three months to get shots “for pain” and is in pain “every day.”
Mr. Centanni refused EMS and did not call 911 on the date of the incident. However, Mr. Centanni testified that the reason he refused EMS was because he was not sure what his insurance would cover. Mr. Centanni testified that he sought treatment from Dr. Martinez, a pain management physician, for his leg shortly after the incident, but could not recall Dr. Martinez’s first name or the name of the clinic. Mr. Centanni took Darvocet the morning before testifying in court, but could not recall the dose, other than that it was one pill that he was supposed to take every four hours.
Mr. Centanni further testified that he had never seen a doctor before the date of the incident for his shoulder pain. Mr. Centanni testified that “Dr. Hadad” at the Pontchartrain Clinic performed “microscopic” surgery on him. Dr. Hadad did not give Mr. Centanni any information as to whether he had arthritis or bursitis in his shoulder. The State introduced a photograph of Mr. Centanni’s facial injuries, which Mr. Centanni also identified in open court.
Detective Villen also testified regarding Mr. Centanni’s injuries. Detective Villen spoke with Mr. Centanni at the scene and observed that he had a “busted lip,” which was photographed by another detective. Detective Villen also testified that Mr. Centanni reported to him that he was hit from behind, knocked to the ground, and kicked in the face by Mr. Buhcannon.
*322 When asked whether Mr. Centanni told him that he was unconscious after being hit in the head, Detective Villen responded in the negative. Detective Villen testified that he did not recall whether his report indicated that Mr. Centanni suffered no injuries. When he was shown his report, which indicated an “N” in the | ir,block for injury, Detective Villen clarified that the “N” was in reference to Mr. Buhcannon, not Mr. Centanni. Detective Villen testified that if he indicated in his report that Mr. Centanni only suffered minor injuries, that at the time, that was the extent of his knowledge regarding Mr. Centanni’s injuries. He confirmed that Mr. Centanni refused EMS.
Considering the foregoing testimony and evidence, the trial judge determined that the State proved beyond a reasonable doubt that Mr. Buhcannon intentionally inflicted serious bodily injury causing extreme physical pain to Mr. Centanni. The trial judge also determined as the trier of fact that the State also proved beyond a reasonable doubt that Mr. Buhcannon attempted to take something of value from Mr. Centanni.
Additionally, the facts of this case are distinguishable from Helou, which involved a second degree battery, and not an attempted second degree robbery. Unlike Helou, the State introduced evidence of extreme physical pain, as Mr. Centanni testified to having surgery and having prescription pain medication injections several times per year as a result of injuries sustained during the robbery, as well as daily prescription pain medication. Mr. Centan-ni also displayed the scars he sustained as a result of the surgery in open court as evidence of disfigurement, unlike the victim in Helou.
When viewed in a light most favorable to the prosecution, these facts support a determination by a rational trier of fact that Mr. Buhcannon intended to attempt to commit the crime of second degree robbery. This assignment of error lacks merit.

|17.INEFFECTIVE ASSISTANCE OF COUNSEL

In Mr. Buhcannon’s second and final pro se assignment of error, he argues that he had ineffective assistance of counsel because counsel failed to properly impeach Mr. Centanni on cross-examination.
In State v. Stovall, this Court recently recognized a defendant’s burden of proof in establishing a claim for ineffective assistance of counsel:
The defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974, but to sustain a claim of ineffective assistance of counsel, he must show that (1) his counsel’s performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An error is prejudicial if it was so serious as to deprive the defendant of a fair trial, or “a trial whose result is reliable,” and, accordingly, to prevail on a claim for ineffective assistance, the defendant must demonstrate a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different. Stnckland, supra. Claims of ineffective assistance of counsel are more appropriately addressed through an application for post-conviction relief rather than direct appeal, State v. Truitt, 500 So.2d 355 (La.1987), but will be addressed on direct appeal in the interest of judicial economy if the record contains sufficient evidence to decide the issue. State v. Peart, 621 So.2d 780 (La.1993).
*323 State v. Stovall, 12-0014, p. 6 (La.App. 4 Cir. 10/17/12), 102 So.3d 994, 998.[5]
Mr. Buhcannon argues that his counsel failed to impeach Mr. Centanni related to an automobile accident that occurred in Jefferson Parish. Mr. Buhcannon alleges that his counsel “was in possession of the documentation evidence that counsel could have impeach[ed] the victim’s testimony in that, the victim did in[sic] fact file a lawsuit [sic] for personal injuries” related to the Jefferson Parish automobile accident. Mr. Buhcannon argues that Mr. Centanni’s injuries could have resulted 11sfrom a vehicle accident which occurred prior to the attempted second degree robbery, and the outcome of his trial would have been different because the “serious bodily injury” element might not have been established beyond a reasonable doubt.
Review of the record indicates that documentation of the personal injury lawsuit was not submitted into evidence at trial. Therefore, because the evidence that Mr. Buhcannon references was not made a part of the record, it cannot be considered on appeal. State v. Crockham, 99-2867 (La.App. 4 Cir. 2/7/01), 780 So.2d 1079; See also State v. Vallot, 05-532 (La.App. 3 Cir. 4/5/06), 926 So.2d 98.
Nevertheless, even if evidence of the personal injury lawsuit was part of the record before this court, the evidence is subject to a harmless error review. State v. Dabney, 633 So.2d 1369 (La.App. 4 Cir.3/15/94) (State’s failure to provide defense with prior arrest records of potential jurors and to include information as part of the record was harmless error). The question then becomes whether there is a reasonable possibility that the evidence complained of might have altered the outcome. State v. Rovaris, 464 So.2d 958 (La.App. 4th Cir.2/12/1985). We have determined that in light of the evidence before this court, the failure to introduce evidence of the personal injury lawsuit did not contribute to the verdict. Therefore, the error was harmless and without merit.

DECREE

For the abovementioned reasons, we find that Mr. Buhcannon’s motion to suppress the out-of-court identification was correctly denied by the trial court, | ^there was sufficient evidence to support his conviction, and Mr. Buhcannon received effective assistance of counsel. Accordingly, we affirm.
AFFIRMED

. The Court listed the following cases where the State established the "serious bodily injury” element:
Our jurisprudence demonstrates many cases where the State proved the "serious bodily injury” element of second degree battery. Some examples are: 1) State v. Abercrumbia, 412 So.2d 1027 (La.1982), where the defendant hit the victim with boards across his head, neck, and arm, causing a "deep cut over his right eye;” 2) State v. Robertson, 98-883 (La.App. 3d Cir. 12/9/98), 723 So.2d 500, writ denied, 99-0658 (La.6/25/99), 745 So.2d 1187, where the defendant knocked the victim to the ground and repeatedly kicked and hit her until she "kind of lost her senses for a minute;” the victim had bruises and contusions over the entire extent of her body, which left significant scars and lacerations on her nose; and 3) State v. Robinson, 549 So.2d 1282, 1285 (La.App. 3d Cir.1989), where the defendant stabbed the victim twice with a large, folding knife.
Helou, 02-2302, p. 7, 857 So.2d at 1028.

. The Court listed the following cases where less substantial injuries were found to constitute "serious bodily injury”:
There are other cases which indicate that less substantial injuries may also constitute "serious bodily injury." See State v. Young, 00-1437, pp. 9-10 (La.11/28/01), 800 So.2d 847, 852-853, where the victim suffered a bloody nose, tenderness in hyoid area below the larynx, and complained of pain at incision in his lower abdominal area. The physician testified that the defendant’s act of choking the victim could have resulted in substantial risk of death, and three months after the attack, the victim continued to have throat problems; State v. Diaz, 612 So.2d 1019, 1022-1023 (La.App. 2d Cir.1993), where the defendant broke the victim’s jaw during a group fight; State v. Mullins, 537 So.2d 386, 391 (La.App. 4th Cir.1988), where a 6 foot tall defendant punched a 5 § 5 girlfriend, breaking her nose; State v. Legendre, 522 So.2d 1249, 1251 (La.App. 4th Cir.1988), writ denied, 523 So.2d 1321 (La.1988), where the defendant raised the victim over his head and smashed her to the floor, rendering her momentarily immobile and requiring a brief hospitalization followed by outpatient treatment leading to a loss of employment for several weeks; State v. Accardo, 466 So.2d 549, 552 (La.App. 5th Cir.1985), writ denied, 468 So.2d 1204 (La.1985), where a 17-year-old female victim was struck on the head by the defendant with either his fist or a blackjack, causing the side of her face to swell.
Id. at pp. 7-8, 857 So.2d at 1028-29.

.The Helou Court noted that "[tjhis Court has held that the phrase ‘extreme physical pain’ as used in [La. R.S. 14:64.4] is not *321 unconstitutionally vague, since it describes a condition which most people of common intelligence can understand.' " Id. at p. 6, 857 So.2d at 1027 (quoting State v. Thompson, 399 So.2d 1161, 1168 (La.1981)).

. Mr. Centanni also testified that he hurt his shoulder while serving in the military in 1955.

. See also State v. Lipscomb, 00-2836, p. 1 (La. 1/25/02), 807 So.2d 218, 219 (recognizing "the general preference for addressing claims of ineffective assistance of counsel in post-conviction proceedings and not on appeal”).