JAMES F. McKAY, III, Chief Judge,
hThe defendant, Samuel Williams, appeals his conviction and mandatory life sentence for the aggravated rape of an eleven-year-old female. Finding no patent errors or merit to his assignments of errors, we affirm his conviction and sentence.
STATEMENT OF THE CASE
The defendant Samuel Williams was charged by grand jury indictment on December 4, 2003, with aggravated rape, a violation of La. R.S. 14:42.[1] The defendant pleaded not guilty at his December 22, 2003 arraignment. The trial court denied defendant’s motion to quash on November 19, 2004; the defendant sought supervisory review in this Court, and this Court denied the defendant’s writ application on January 14, 2005.[2] On June 3, 2005, the trial court granted the defendant’s motion filed under La. C.E. art. 412 to introduce evidence of the victim’s past sexual behavior. The State sought supervisory review, and this Court granted relief, barring the *602 defendant from introducing such evidence.[3] On the [^defendant’s application for a writ of certiorari to this Court, the Louisiana Supreme Court granted the writ in part, and denied it in part.[4]
On January 14, 2008, the trial court denied the defendant’s motion to quash; that same date this Court denied the defendant’s emergency writ application seeking supervisory review of that ruling.[5] The defendant was tried on October 14,16, and 17, 2008, but a mistrial was declared after the jury was unable to arrive at a verdict. On August 12, 2009, the defendant filed in this Court a pro se writ of habeas corpus, arguing that a second trial on the same charge without new evidence would constitute double jeopardy; this Court denied the writ on August 20, 2009.[6] On October 9, 2009, the trial court granted the defendant’s pro se motion to disqualify the Orleans Parish District Attorney’s Office, appointing the Louisiana Attorney General’s Office to prosecute. The State sought supervisory review, and this Court reversed.[7]
The defendant’s second trial commenced on June 16, 2010. On that same date the State informed the trial court that DNA evidence thought lost in the aftermath of Hurricane Katrina had been found. The trial court denied the defendant’s motion for a continuance, but this Court granted the defendant’s emergency application for supervisory writs and reversed the judgment of the trial court.[8] Consequently, a second mistrial was declared. On July 14, 2010, the defendant filed in this Court a pro se motion seeking to recuse the Orleans Parish | (¡District Attorney’s Office for the second time. This Court denied the writ application on July 19, 2010.[9]
On February 22, 2011, the first day of what would have been the defendant’s third trial;the trial court ruled that the defendant could waive trial by jury and elect a trial by judge. This Court granted the State’s emergency request for a stay that date, and on February 23, 2011, granted the State’s emergency writ application, reversing the judgment of the trial court.[10] A February 23, 2011, minute entry stated that no new date had been set for the case.
The defendant’s third trial, before a twelve-person jury, was held August 8-11, 2011, at the conclusion of which the defendant was found guilty as charged. On August 31, 2011, the trial court denied the defendant’s motion for new trial. The defendant announced his readiness for sentencing, and the trial court sentenced him to mandatory life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The defendant filed his motion for appeal on September 15, 2011, which was granted that date.
*603 The record was lodged with this Court on February 27, 2012. The defendant filed his counseled appellate brief on March 23, 2012. The State filed its appellate brief on May 3, 2012.
FACTS
The New Orleans Police Department Assistant 911 Communications Supervisor Cindy Woods identified State Exhibits 1 and 2, a May 9, 2000 incident recall and a 911 call recording from the same date, respectively, under Item # E09172-08. The 911 recording was played for the jury. Ms. Woods testified on [4cross examination that it was her impression that the call originated from a hospital, and that the person on the telephone during the 911 call was on the hospital staff. The caller reported that the victim was at 4653 Desire Street.
New Orleans Police Department Sergeant Arnold Williams was assigned as a detective to the Child Abuse Unit in May 2000. On May 10, 2000, he responded to a call of an aggravated rape involving the defendant as the alleged perpetrator. The detective went to the location where the victim and her mother were. He subsequently obtained an arrest warrant for the defendant for aggravated rape based on the information given to him by the victim. He identified State Exhibit 3 as the application for the arrest warrant and the warrant itself.
Sergeant Williams stated that the victim was eleven years old, while the perpetrator, the defendant, was forty-six. Sergeant Williams and a female detective met with the victim, T.W.[11], and her mother, T.W.2, on May 20, 2000, at Causeway Medical Center. The detectives had been informed that the victim was going to have an abortion, and they wanted to obtain the fetus for DNA analysis. Detective Williams identified the evidence and property room receipt for the fetus, as well as a request for DNA testing. Detective Williams confirmed on cross examination that he wanted to have the DNA from the fetus compared to that of the defendant. He believed someone from the District Attorney’s Office collected a blood sample from the defendant, but he had no idea how it was collected or whether it ultimately was sent away for DNA testing. Detective Williams was not present for the victim’s interview at the Child Advocacy Center.
|,,T.W.2, the victim’s mother, testified that she had two children, including the victim, T.W. T.W.2 identified T.W.’s birth certificate, listing her date of birth as June 23, 1988. T.W.2 confirmed that T.W. was eleven years old in October 1999 through May 2000. The defendant dated T.W.2’s mother, after T.W.2’s mother, P.K. got divorced from her father. The defendant and P.K. had two children, S.K. and L.K.T. W2 testified that the defendant was something like a grandfather to the victim, T.W.
After T.W.2’s mother, P.K., died, she helped the defendant so he could remain in the Desire Housing Project apartment where he had lived with P.K. and the couple’s two children, S.K. and L.K. She and T.W. lived ten minutes from the defendant and his children. T.W.2 testified that on the weekends T.W. would sometimes go to the defendant’s residence to play with S.K. and L.K. T.W.2 testified that after October 1999, T.W. stopped wanting to go to the defendant’s residence. In May 2000, a blood and/or a urine test revealed that T.W. was pregnant. T.W.2 testified that after learning of T.W.’s pregnancy she thought of a lot of things, including how T.W. had stopped going to the defendant’s *604 residence. She also had observed that when the defendant would come to her residence he would chide T.W., “Oh [T.W.], you’re not speaking?” Or he would say to T.W., “You acting funny?” T.W.2 testified that in fact T.W. would be acting funny, and that she would make T.W. come out of her room and speak to the defendant.
T.W.2 also recalled a period when the defendant would telephone her in the mornings, around seven or eight o’clock. T.W.2 said she would go to work at noon during this period. She also learned that the defendant would come to her residence when she was not present. T.W.2 said the defendant would say that he came to her residence to borrow things, like videotapes, towels, or money. She Rtold the defendant that T.W. was not supposed to let anyone inside. T.W.2 questioned T.W. at the emergency room about her pregnancy, and T.W. finally admitted that the defendant was responsible. T.W.2 took T.W. to Children’s Hospital. T.W.2 made the decision to have T.W., who was eleven years old, undergo an abortion.
T.W.2 confirmed on cross examination that she was thirteen or fourteen years old when the defendant began his relationship with her mother, P.K. The defendant lived in the household with them. She moved out when she was seventeen years old, but until then she had lived in the same household with her two children, T.W. and a son, her mother, the defendant, and their two children. T.W.2’s mother died in 1992, when T.W.2 was twenty-two years old. T.W.2 confirmed that the defendant’s son S.K. was approximately fifteen years old when she found out T.W. was pregnant.
T.W., the victim, was twenty-three years old at the time of trial. Her date of birth was June 23, 1988. T.W. testified that in October 1999, she went to the defendant’s residence to play with S.K. and L.K. At some point she went inside to get some water, and the defendant called to her from L.K.’s room. She went inside the room, and the defendant closed the door. He laid her on the bed, placed her hands above her head, and he raped her. He put his penis in her vagina. It was painful. Afterward, the defendant told her not to tell anyone, or she would get into trouble. She said it happened several more times.
T.W. remembered the last time the defendant assaulted her was when the defendant came to her residence. He first arrived with S.K. and L.K. They stayed for a couple of minutes before he left with them. He returned alone. She let him back inside because he knew she was there. She went to the backroom because she |7already knew what he wanted. He again laid her on the bed and he molested her. T.W. had never had sex with anyone before the defendant. She had never done anything with boys before. She had never kissed a boy. She said the defendant wore a condom a couple of times, but generally did not. She did not tell anyone when it was happening because she believed she would get into trouble if she did. In May 2000 she broke out in hives, and her mother took her to a hospital emergency room, where she learned that she was pregnant. When her mother asked her who had done it to her, at first she said nothing, because she was afraid she was going to get into trouble. She finally answered truthfully, naming the defendant.
T.W. replied in the negative when asked on cross examination whether she had any knowledge of sexual terms, stating: “At 11, no.” T.W. did not remember telling Detective Williams that it had happened only once, at the defendant’s residence. However, she said she would not have told the detective that because it was not true. T.W. confirmed describing being raped at her residence.
*605 Dr. Scott Benton was qualified by joint stipulation as an expert in the field of forensic pediatric medicine. In May 2000, he was the medical director of the pediatric forensic medical center at Children’s Hospital. The standard procedure was to get a medical history and perform a full head-to-toe physical examination. Dr. Benton testified that at that time interviews of victims were not recorded. Dr. Benton testified to the concept of delayed disclosure of sexual abuse by children and the concept of sexual abuse accommodation syndrome, used to describe the fact that children who are repeatedly sexually abused learn to accommodate it, meaning that they do not react negatively to the abuse as it occurs over time.
18Pr. Benton testified that T.W. gave a history of being raped on more than one occasion by an individual she named as “Sam.” T.W. reported that the last incident occurred three weeks prior to the May 10, 2000 examination, and that the first incident had been what he recalled as seven months prior. T.W. told him that Vaseline was used to facilitate the sex. She told him she did not disclose those things to anyone until she was told at Lakeland Hospital that she was pregnant. T.W.’s head-to-toe physical examination was normal. She had normal external genitalia. T.W.’s hymen was normal. There were no injuries to the vagina.
Dr. Benton agreed on cross examination that the main reason children lie is to avoid getting into trouble, but that reason was equally balanced with lying to gain favor. Dr. Benton confirmed on cross examination that his physical examination of T.W. was unremarkable; that he saw no evidence of tears to her vagina; and that her hymen was intact. Dr. Benton confirmed that he had examined victims of sexual abuse in which he observed tears to the hymen of the victim and the vaginal walls, and bruising to the cervix. He confirmed that in the instant case he saw none of those things. Dr. Benton agreed that in 2000 paternity testing of a fetus could have definitively revealed paternity.
Dr. Benton’s report of his examination of T.W. was introduced in evidence for publication to the jury as State Exhibit 9, with defense counsel first objecting to such introduction, but then expressly withdrawing that objection. On redirect examination Dr. Benton confirmed that he had examined many eleven-year-old children, and that it was not uncommon for them to know the words “sex,” “penis,” or “vagina.” T.W. used those words when giving her history of abuse to Dr. Benton. He also confirmed that healing in the vaginal area takes an average of two weeks. T.W. had reported that the last incidence of abuse had occurred three | aweeks before her examination. Dr. Benton also confirmed that if the victim of sexual abuse goes along with the abuse, there is less chance of tearing and damage to the vaginal walls.
New Orleans Police Department Lieutenant Iris Cary was a child abuse detective in May 2000. She accompanied Sergeant Williams to T.W.’s abortion procedure. She was there while the abortion was performed, and she retrieved the fetal tissue. She identified State Exhibit 4 as a receipt, dated May 20, 2000, showing that she placed that fetal tissue on the books in the Central Evidence and Property Room.
Gina Pineda, who had a B.S. degree in microbiology with a minor in chemistry, and a M.S. degree in pathology with a concentration in forensic DNA from LSU Medical School, was qualified as an expert in the field of molecular biology and forensic DNA analysis. Ms. Pineda identified State Exhibits 10 through 14 as certificates of accreditation for Reliagene Tech *606 nologies, a local laboratory with whom Ms. Pineda was formerly employed. She became the technical leader for Reliagene, responsible for implementing new procedures and validating them, for analyst training, for safety, and for quality control in the laboratory.
Ms. Pineda identified State Exhibits 15 and 16, respectively, as November 18, 2000 and July 21, 2004 reports issued in this case by Reliagene. Ms. Pineda testified that “Short Tandem Repeats” (“STR”) DNA testing by Reliagene in 2000 of a reference blood sample from T.W. (State Exhibit 18), a reference blood sample from the defendant (State Exhibit 19), and a product of conception tissue (State Exhibit 20), revealed fetal DNA in only three of thirteen genetic markers. She said that while those three markers were consistent with the defendant and thus |inhe could not be excluded from paternity, Reliagene could draw no conclusions regarding the paternity of the fetus without further DNA analysis because of the limited genetic markers found. Ms. Pineda testified that if three genetic markers had been found that were inconsistent with the defendant, he would have been excluded.
Ms. Pineda stated that in 2001 Relia-gene did “YSTR” DNA testing of the same fetal material and was able to get a male profile from it. Reliagene also did “YSTR” testing of the defendant’s reference blood sample and obtained a male DNA profile from it. Comparison of those two male profiles showed they were the same, and Reliagene concluded that the probability of the defendant’s paternity of the fetal material was 99.1 percent, as compared to an untested, unrelated person of the African American population. Ms. Pineda further explained, as to the “unrelated” part of that paternity probability, that it was unique not simply to the defendant, but to his whole paternal lineage. She stated that three years after the “YSTR” DNA testing report was issued, Reliagene became aware of S.K., the defendant’s biological son. She said that fact invalidated the “YSTR” comparison results because it meant that either the defendant or S.K. could have been the biological father of the fetus.
Ms. Pineda testified that Reliagene subsequently performed a third DNA test, a “YSTR” one, on the fetal material. For this test Reliagene doubled the amount of fetal material used for the test and employed a new extraction method in the hope of obtaining “cleaner DNA” and “more DNA” from the fetus than in the two prior tests. Using the new extraction method Reliagene was able to obtain more markers from the fetus, six total markers that it knew were from the fetus. A reference buccal swab was obtained from the defendant’s son, S.K., and DNA was 11T extracted from it. Comparing the fetal DNA markers to the DNA profile, Relia-gene excluded S.K. as the biological father of the tested fetal material. Comparison of the defendant’s DNA profile to the six DNA markers derived from the fetal material using the new extraction method revealed that the defendant’s profile was consistent with all six of the fetal markers. Thus, the defendant could not be excluded as the biological father of the fetus. Ms. Pineda testified that, using the statistical analysis on the “YSTR” profile, the probability of the defendant’s paternity was 99.5 percent when compared to an untested, unrelated, random person of the African-American population. She also testified that performing the statistical analysis on the STR profile, the probability of paternity was 99.98 percent. Ms. Pineda testified that the minimum requirement to establish paternity was 99.0 percent.
Ms. Pineda admitted on cross examination that not all African American males *607 had been DNA tested, nor did she know how many had. She said that the statistical probabilities she had referred to were extrapolations using known information. In the case of “STRs,” Ms. Pineda said the data base was comprised of two hundred individuals of African American descent. She said it had been found that because of the way DNA gets inherited, a database of two hundred individuals was sufficient to extrapolate those statistical numbers. She said the number of DNA profiles in the “STR” database had not changed from two hundred.
Ms. Pineda said that when the first statistical calculation was done in the instant case, the “YSTR” database had one hundred sixteen individuals of African American descent in it. That number had grown to two thousand thirty-nine individuals by 2004. She said the more information one has with “YSTRs” the | ^better. Ms. Pine-da was not present when the blood sample used in the DNA analyses was collected by the District Attorney’s Office from the defendant, and she did not know whether it was collected consistent with the protocols that she knew existed. She could not verify whether any type of contamination had occurred prior to her receiving it. However, Ms. Pineda testified that had it been contaminated with, for example, the DNA of another person (meaning two people total), that would have been evident in the test results, given that one can tell when there is a mixture of DNA. She said from the defendant’s blood sample Reliagene obtained one male DNA profile. When defense counsel referred to environmental contamination, Ms. Pineda replied that if samples are exposed to environmental contamination such as heat or humidity that can be seen in test results. She said there was no evidence of any such environmental contamination in the case of defendant’s blood sample because Reliagene was able to obtain a full profile from the sample.
Similarly, she did not know who took the buccal swab from the defendant’s son, S.K. She did not believe anyone from Reliagene took the sample or was present when it was taken. When questioned as to whether the buccal swab was taken from someone named S.K., Ms. Pineda replied that, although she did not know, the DNA extracted from the swab revealed that the donor was a biological offspring of the defendant because one-half of his DNA was consistent with the defendant’s DNA. Ms. Pineda confirmed that in a July 2004 Reliagene report issued in the case, item numbers were assigned to the samples tested to keep track of them. T.W.’s sample was numbered 875, the defendant’s was 876, and the fetal material was 877. She confirmed that there was a typographical error in the report designating T.W.’s sample as 876, instead of the correct 875, with the defendant’s |iasample being also designated as 876 at that point. Ms. Pine-da confessed she had been unaware of the typo until defense counsel pointed it out to her on cross examination. She later testified on redirect examination that she was confident there had not been an actual sample switch in any of the testing. Ms. Pineda agreed that there are several thousand markers in every strand of DNA, but that they used thirteen markers in “STR” tests to make comparisons and five for the “YSTR” testing and comparisons.
NOPD Detective Arnold Williams, recalled as a witness by the defendant, confirmed that in his police report he stated that either the victim, T.W., or her mother, T.W.2, had related to him that when T.W.2 was questioning T.W. about who had impregnated T.W., T.W.2 specifically asked T.W. if it had been the defendant, mentioning him by name. Detective Williams did not recall whether he had gotten this information from T.W. or T.W.2. Detective Williams testified that at one time he be *608 lieved T.W.’s fetus had been lost or misplaced. He recalled that had been after Hurricane Katrina. Detective Williams further confirmed that he had obtained an arrest warrant for the defendant’s arrest for one count, and that in June 2010 he added additional counts, based on TW.’s assertion that it had happened more than the one time she had originally described.
Detective Williams confirmed on cross examination by the State that he was not present when the conversation occurred between T.W. and TW.2 during which T.W.2 allegedly asked T.W. if the defendant had impregnated her.
L.K., defendant’s daughter with T.W.2’s mother, the late P.K., testified that a “Mr. Floyd” was the defendant’s brother, her uncle. She pointed her Uncle Floyd out in court. L.K. confirmed that her Uncle Floyd used to bring his daughter, L.K’s cousin, Floydene, over to play. She replied in the affirmative when asked 114whether the defendant was ever around when Floydene was over. L.K. replied in the affirmative when asked whether she remembered an incident when her brother, S.K., touched her in a way she thought was inappropriate. L.K. thought she had been around eleven or twelve years old when that happened. She said S.K. was six or seven years older than her. L.K. confirmed that a couple of the defendant’s other daughters were in court that day. L.K. confirmed that she knew T.W.2 and T.W., and that she remembered them living with her.
L.K. confirmed on cross examination that she had testified at trial for her father before. L.K. also confirmed that she had never testified before that S.K. had touched her. She explained that she had not been asked about that. She replied in the negative when asked on redirect examination whether at the prior trial either defendant’s attorney or the prosecutor had asked her any questions about her brother, S.K. L.K. replied in the affirmative when asked whether T.W. used to come over to her home and play with her and S.K. L.K. also replied in the affirmative when asked whether she and S.K. used to go to T.W.’s house with the defendant.
Jay Daniels, an attorney, confirmed that he and the defendant’s defense counsel worked cases together from time to time, and that they had represented the defendant at trial previously. Mr. Daniels remembered that a fetus was missing on the first day of that previous trial, during jury selection, but that as they were to begin opening statements the fetus turned up. Mr. Daniels replied in the affirmative when asked if the defendant’s counsel had told him that he wished to try the case alone this time. Mr. Daniels stated on cross examination that the reason given by the State for the missing fetus was Hurricane Katrina.
| isT.W.2, the victims’ mother, recalled as a witness by the defendant, agreed that she had suggested that T.W. get an abortion, given that she was only eleven years old. She did not recall testifying earlier on direct examination and using the term “fetus” when talking about the abortion. She agreed that the day before she had testified about the defendant hitting her.
T.W., recalled as a witness by the defendant, replied in the negative when asked whether anyone had been inside on any of the occasions when the defendant allegedly assaulted her. She confirmed that she decided to have an abortion after speaking with her mother. She said she had the abortion because she was young and she did not want the baby of a rapist. She replied in the negative when asked whether the prosecutor ever told her and her mother certain things to say in response to certain questions. She admitted talking with the prosecutor before she testified. *609 On cross examination by the State, T.W. pointed out the defendant in court as the person who had raped her. She replied in the negative when asked whether the defendant’s son, S.K., had sex with her.
ERRORS PATENT
A review of the record reveals no patent errors.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error the defendant argues that the trial court erred in “allowing the State to improperly corroborate T.W.’s testimony with a hearsay statement.”
This assignment of error pertains to testimony by forensic pediatrician Dr. Scott Benton as to what T.W. related to him in giving her medical history. Dr. Benton testified that he asked T.W. to tell him what happened, and she said it was about her uncle and aunt’s father. Dr. Benton asked T.W. the individual’s name, |1fiand she replied “Sam,” at which time defense counsel objected on the ground of hearsay, noting that it was not admissible under the first report exception to the hearsay rule. The State cited La. C.E. art. 803(4), and the trial court overruled the objection. Dr. Benton continued relating the history given him by T.W. However, several sentences later the trial court interrupted the doctor, asked counsel to approach, and removed the jury. The court then held a bench conferenee/hearing on the issue.
La. C.E. art. 803(4) states:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
At issue for the trial court in the instant case was the determination whether T.W.’s statements to Dr. Benton were made for “purposes of medical treatment and medical diagnosis in connection with treatment.” The trial transcript reflects that the trial court gave ample consideration to the arguments on both sides of this issue, ultimately concluding that such history was relevant to both diagnosis and treatment and that it was admissible for treatment purposes.
The trial court considered, as pointed out in the Official Comments to La. C.E. art. 803(4), that, although that provision “follows” Federal Rule of Evidence 803(4)[12], it is narrower than F.R.E. 803(4), in that La. C.E. art. 803(4) excludes 117from its coverage statements made solely for the purpose of diagnosis — “[t]he reliability deemed generally to inhere in statements made for purposes of medical treatment does not extend to statements made solely for diagnosis.” However, the exception provided for in La. C.E. art. 803(4) expressly applies to statements made solely *610 for the purpose of medical diagnosis in connection with treatment.
Dr. Benton testified during the bench conference/hearing on this issue that he treated T.W. for sexual abuse, and that at that instant he considered himself to be her treating physician. The trial court asked what the treatment was, and Dr. Benton replied that in case of a child alleging sexual abuse, where the child has been impregnated, he had to ascertain her health at the time of the examination; what kind of services they could provide to her; and how they could continue to protect her.
The trial court noted that Dr. Benton was not an OB/GYN and asked the doctor what treatment he provided to the victim. Dr. Benton noted that the absence of treatment was also sometimes treatment, and he stated that in the instant case he did not provide any specific treatment “in the realm of medicine or actual laying of hands or surgery or that sort of thing.” However, he said he referred T.W. for | ^counseling as soon as possible. Dr. Benton replied in the affirmative when the trial court asked if the treatment was “just referral to some other location.” Dr. Benton could not recall what medical doctor to whom he referred T.W., and he said it was not in his notes that he had in front of him.
Dr. Benton replied in the affirmative when asked if statements T.W. made to him were made in regards to his treatment of her. Dr. Benton noted that “[tjhere are many visits where a person visits a doctor with an expectation of a specific medicine or whatnot,” and that “the absence of the provision of that doesn’t mean that the expectation for treatment doesn’t exist or that an opinion doesn’t constitute medical treatment.” Dr. Benton stated that he is the one who coordinates and helps plug the victim into “the system in a system that otherwise doesn’t like dealing with sexually abused kids. And that is a form of medical treatment.”
The prosecutor asked Dr. Benton whether his medical treatment “was that [the victim] needed counseling as soon as possible,” and he asked the doctor that if there had been tears in her vaginal area or she had herpes or any type of SDT he would have recommended the proper course of treatment for that also. Dr. Benton replied to these questions: “Correct.” At this point defense counsel agreed “that would have been medical treatment,” but stated that “[cjounseling as soon as possible” was “not the same as go see an OB/GYN for treatment for an SDT and herpes.”
Dr. Benton confirmed that after his physical examination of T.W. and the taking of her history, his recommendation was that she needed counseling as soon as possible, noting that she had a tough decision ahead of her insofar as deciding whether to continue the pregnancy and deal with the consequences of carrying a [ 19child from what was alleged to have been a rape. Dr. Benton also stated that knowing the name of the perpetrator was relevant to that part of his job involving protecting the victim, and that one needed to know from whom she needed protection.
The trial court noted the tender age of the victim when considering whether the identity of the abuser was important to the diagnosis and treatment of the victim. The court noted the absence of any Louisiana case on point and concluded such evidence was admissible for treatment purposes.
On appeal, the defendant cites State v. James, 2002-2079 (La.App. 1 Cir. 5/9/03), 849 So.2d 574, where the defendant, convicted of aggravated incest, argued on appeal that the trial court had erred in admitting testimony by Dr. Benton (the same *611 Dr. Benton in the instant case) as to the history given him by the victim, detailing the sexual acts the defendant perpetrated on her. The defendant argued that the portions of Dr. Benton’s hearsay testimony concerning the sexual acts exceeded the scope of La. C.E. art. 803(4), the same argument defendant in the case presents. Dr. Benton testified in James that it was his practice to take a complete oral history from the child to determine “any issues that the child might have that I might be able to help them with.” James, 2002-2079, p. 14, 849 So.2d at 585. Thus, the court stated: “Dr. Benton’s questioning KC. about the sexual abuse served a diagnostic purpose.” Id. However, the court said nothing about treatment, and to fall under La. C.E. art. 808(4) the diagnosis must be in connection with treatment.
In any case, the court in James went on to find that even assuming such hearsay statements went beyond La. C.E. art. 803(4), the admission of such statements was harmless error because it was merely cumulative of the direct | ?nevidence and the statements made by the victim during her videotape interview, which the State had introduced. The court also noted that it had already determined that the testimony of the victim alone was sufficient to establish defendant’s specific intent to commit the crime of aggravated incest and the commission of specific acts in furtherance thereof.
The defendant argues that there can be no harmless error in the instant case, given that there was no audio or video recording of T.W.’s interview by Dr. Benton and because Dr. Benton’s hearsay testimony contained facts to which T.W. herself had not testified. The defendant also points out that while Dr. Benton related that T.W. told him that as the defendant was “pounding her” the defendant kept saying, “Give me three more minutes. Give me three more minutes. Give me three more minutes,” T.W. did not mention these statements by him in her testimony. Nor, the defendant points out, did T.W. mention the defendant having sex with her from the rear, while Dr. Benton related that T.W. told him that the defendant “pounded her from the rear.” Finally, the defendant notes that Dr. Benton testified that T.W. “specifically noted that Vaseline was used to facilitate the penetration of her vagina.” T.W. did not mention this in her testimony.
The defendant argues that Dr. Benton’s testimony was thus used not only to corroborate T.W.’s testimony, but to expand it beyond what T.W. herself gave. Thus, he submits, the admission of Dr. Benton’s testimony, if erroneous, could not have been harmless error.
A trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. State v. Cyrus, 2011-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565, citing State v. Richardson, 97-1995, p. 14 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 122. Also, a trial court is vested -with much | ⅞1 discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect under La. C.E. art. 403. State v. White, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204. Further, a trial court’s ruling admitting/permitting the introduction of evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. State v. Magee, 2011-0574, p. 49, fn. 37 (La.9/28/12), 103 So.3d 285, 320, fn. 37 (“Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the *612 Court admitted the statements, implicitly-finding that their probative value substantially outweighed the danger of ‘unfair prejudice, confusion of the issues, or misleading the jury.’ La. C.E. art. 403.”).
The State cites State v. Morgan, 45,110, pp. 26-27 (La.App. 2 Cir. 4/14/10), 34 So.3d 1127, 1143, where the court held that a statement by a hospital physician that a rape victim reported to the hospital because she had been sexually assaulted was an exception to the hearsay rule because it was made for the purpose of medical treatment and diagnosis. This is the hearsay exception provided by La. C.E. art. 803(4). However, that statement by the victim in Morgan apparently was just a general one that she had been raped or sexually assaulted. The victim did not identify/name her attacker in the statement, as T.W. did in the instant case.
The State also cites State v. Thom, 615 So.2d 355, 363 (La.App. 5 Cir.1993), where the defendant complained on appeal that the trial court had erred in permitting an emergency room nurse at a hospital where a rape victim was treated to testify concerning statements the victim made concerning her complaints and 122how her physical and sexual attack occurred. The court held that this evidence was admissible pursuant to La. C.E. art. 803(4). The court stated:
These statements were pertinent to the diagnosis of the victim’s physical and psychological condition and the type of trauma which the victim suffered. They were also pertinent to determine the treatment which was necessary for the victim’s physical and psychological injuries.
Thom, 615 So.2d at 363.
In State v. Coleman, 95-1890 (La.App. 4 Cir. 5/1/96), 673 So.2d 1283, the victim was referred to a physician by the district attorney’s office some eighteen months after the alleged sexual abuse occurred. The victim received no treatment as a result of the evaluation. This Court recognized that, although a subsidiary purpose of the examination was the identification and treatment of any sexually transmitted diseases or other physical harm that may have resulted from the rape, the “principal reason for the examination was forensic.” 95-1890 at p. 5, 673 So.2d at 1287.
Accordingly, this Court found in Coleman that the history given to the examining physician by the victim was not admissible under La. C.E. art. 803(4). This Court found the error was harmless, however, as the twelve-year old victim testified in detail about the incidents, which had only been briefly reported in general terms by the physician. In addition, the victim’s mother testified to finding the defendant in an aroused state after the victim came running into her room following one attempted rape, and the defendant also made some inculpatory statements. The court found beyond a reasonable doubt that the improperly admitted testimony by the physician did not contribute to the verdict “in an otherwise strong case for the State.” 95-1890 at p. 6, 673 So.2d at 1287.
|aIn Author’s Note (2), La. C.E. art. 803(4), Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p. 657 (2011), the authors state that “it would appear that part of a declaration made to a physician by the victim of an alleged sexual assault identifying the perpetrator” “would not qualify under this exception.”
However, in the instant ease, as in Thom, and especially considering the testimony of Dr. Benton as to his need for the information insofar as referring the victim for treatment in the form of counseling for her psychological injuries, the statements appear to have been admissible for pur *613 poses of medical treatment and medical diagnosis in connection with treatment pursuant to La. C.E. art. 803(4).
Moreover, insofar as Dr. Benton testifying that T.W. told him that “Sam” was the perpetrator of the acts, this was merely cumulative to testimony by T.W. that the defendant assaulted her; to testimony by T.W.2 that T.W. told her the defendant had assaulted/impregnated her; and to the results of the DNA testing which identified the defendant as the father of T.W.’s unborn child.
The erroneous admission of evidence is subject to harmless error analysis. State v. Hugle, 2011-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613, citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Walker, 99-2868, p. 8 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, 223. See also State v. Johnson, 389 So.2d 1302 (La.1980)(admission of hearsay testimony is harmless error when the effect is merely cumulative or corroborative of other testimony adduced at trial). An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172; State v. Barbour, 2009-1258, p. 14 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1150.
Even assuming for the sake of argument that the trial court erroneously admitted any of the testimony by Dr. Benton as to what the victim told him about the acts perpetrated by the person who sexually abused her, including that the perpetrator’s name was “Sam,” it can be said beyond a reasonable doubt that the guilty verdict rendered in this case was surely unattributable to such error.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues that the trial court erred in permitting Dr. Benton to testify as an expert because there was no issue at trial that required an expert’s clarification or explanation.
However, Dr. Benton was called as an expert witness in the field of forensic pediatric medicine -without any objection by defense counsel. Moreover, after the State had gone over Dr. Benton’s qualifications and had offered him as an expert in the field of forensic pediatric medicine, defense counsel stipulated to his qualification as such an expert. In addition, at one point the State asked a question of Dr. Benton, and defense counsel objected, stating: “Objection, he’s an expert in Forensic Pediatric Medicine.” The trial court sustained that objection. Finally, defense counsel cross examined Dr. Benton, using the doctor’s expertise to the defendant’s advantage.
It is well-settled that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La.C.Cr.P. art. 841(A); State v. Marlowe, 2010-1116, p. 35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 965-966, writ denied, 2012-0231 (La.5/18/12), 89 So.3d 1191. Not only does an objection |25have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Ott, 2010-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287, writ denied, 2012-0291 (La.5/25/12), 90 So.3d 408.
In the instant ease, the defendant not only faded to object on any ground whatsoever to Dr. Benton testifying as an expert in the field of forensic pediatric *614 medicine, defense counsel stipulated to Dr. Benton’s qualification as such an expert.
Under these circumstances, the defendant has failed to preserve this issue for appellate review.
ASSIGNMENT OF ERROR NO. 3
In his third assignment of error the defendant argues that the trial court erred in failing to grant his motion for a mistrial when a state witness, the victim’s mother, T.W.2, made repeated references to what the defendant characterizes as “other crimes” and/or “bad acts” allegedly committed by him.
The State questioned T.W.2 concerning the defendant’s actions during the period from October 1999 to March 2000, around when T.W. stopped wanting to go to the defendant’s residence to play with his son, S.K. and daughter, L.K., who were also T.W.2’s uncle and aunt. T.W.2 first testified that the defendant would continually call her in the morning, and when she would ask why he was calling he would vaguely say that he just wanted to have a conversation or that he needed some money from her. The State then asked T.W.2 if she ever learned that the defendant had been coming to her residence when she was not there. She replied;
A Yes, I would call. Things was missing out of my house. Which [sic] I’d come home from work, YCR tapes was missing, towels was missing. I’d call him, “Why you come over, because you know my daughter is not | ^.supposed to let no one in?” And, you know, “She’s home alone.” And he’s like, “Oh, I just came over for a VCR,” or “I came asking for money.” But it never dawned on me—
BY MR. FULLER [defense counsel]:
Objection, move for a mistrial.
At that point the trial court called for sidebar, which, the transcript reflects, was brief and not recorded. Afterward, the State asked T.W.2 if the defendant borrowed those things from her, a question to which defense counsel objected as leading, which objection the trial court sustained. The State next asked, “The VCR and the money, he was borrowing those things from you?” Again, defense counsel’s objection as to leading was sustained.
The State next asked T.W.2 what the defendant was doing with the VCR tapes and the money. T.W.2 simply replied to the effect that the defendant always had an excuse for coming to her home. The State then asked T.W.2 what she did after all these things went through her head when she took T.W. to be examined. She started to say that she asked T.W. something, whereupon the trial court asked counsel to approach, and a brief unrecorded sidebar was held. After the sidebar, the State asked T.W.2 if the defendant had returned “that VCR”[13] to her, and she replied in the negative. At that point, defense counsel objected and, after the jury was removed, moved for a mistrial on the ground that this constituted evidence of other crimes committed by the defendant.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, |27be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the ac *615 cused, the prosecution in a criminal case shall provide reasonable notice in ad-vanee of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
La.C.Cr.P. art. 770(1) states that upon motion of a defendant, a mistrial shall be ordered when a remark made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to, inter alia, another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
While T.W.2 was a witness, not a judge, district attorney or court official, where a district attorney asks a State witness a direct question about other crimes, the remark by the witness about other crimes can be imputed to the state. State v. Juarbe, 2001-2250, p. 8 (La.App. 4 Cir. 7/31/02), 824 So.2d 1240, 1247. However, the comments must be viewed in light of the context in which they were made, and no violation occurs if the comments only “arguably” point to another crime or bad act. State v. Dillion, 99-2175, p. 7 (La.App. 4 Cir. 9/6/00), 770 So.2d 13, 19. The remark must unmistakably point to evidence of another crime in order to trigger a mandatory mistrial pursuant to La. C.CrJP. art. 770(2). Id.
In the instant case, it was clear that the thrust of T.W.2’s testimony was that, viewing the defendant’s actions in hindsight, she believed he had been coming to her home to molest her daughter under the pretext of borrowing VCR tapes, or towels, money, etc. She did not accuse the defendant of being a thief. It is unclear why the State asked T.W.2 if the defendant had returned the VCR. However, T.W.2 s reply that the defendant had not returned the VCR was not an | ^unmistakable reference to another crime or bad act, given the context of the line of questioning as well as the fact that she said he originally had borrowed it (them-VCR tapes).
Considering the circumstances, a mandatory mistrial was not warranted, and the trial court properly denied the motion therefor.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 4
In the defendant’s last assignment of error, he argues that the trial court erred in “compelling” him to undergo a jury trial when he allegedly had made a timely and irrevocable waiver of trial by jury on February 22, 2011.
At issue in this assignment of error is a 2010 amendment to La. Const, art. I, § 17(A), providing that, “[ejxcept in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury but no later than forty-five days prior to the trial date and the waiver shall be irrevocable.” The defendant’s third trial had been set for February 22, 2011. On that date the trial court asked defense counsel his choice of a judge or jury trial, and defense counsel stated that the defendant wished to be tried by a judge. The State cited the 2010 amendment to La. Const, art. I, § 17(A); noted that the amended provision had gone into effect in December 1, 2010; and argued that the defendant had failed to timely choose a judge trial— at least forty-five days prior to the trial date.
The defendant’s trial counsel argued that the defendant’s case was from 2000, before the 2010 amendment. The trial court implicitly agreed, asking the defense *616 if it was ready for trial, saying to the State that the defendant was electing a judge trial, and asking the State if it wished a continuance. The State replied that it did, and the trial court denied the continuance.
12;iThis Court granted the State’s emergency request for a stay that date, February 22, 2011. On February 23, 1011, this Court granted the State’s emergency writ application, reversing the judgment of the trial court. State v. Williams, 2011-0248, unpub. (La.App. 4 Cir. 2/23/11). The record does not show that the defendant sought a writ of certiorari to the Louisiana Supreme Court on this issue. The defendant’s third trial, before a jury, was held August 8, 2011. He was found guilty as charged. The defendant’s motion for new trial was denied on August 31, 2011.
There is no merit to this assignment of error.
For the foregoing reasons, we find that the defendant’s conviction and sentence are affirmed.
AFFIRMED

. The instant case was a reinstitution of the prosecution. The defendant had been indicted on August 24, 2000 in case number 416-335 for one count of aggravated rape. The State nolle prosequied that case on December 11, 2003.

. State v. Williams, 2004-2163, unpub. (La.App. 4 Cir. 1/14/05).

. State v. Williams, 2005-0873, unpub. (La.App. 4 Cir. 6/3/05).

. State v. Williams, 2005-1560 (La.4/24/06), 927 So.2d 266.

. State v. Williams, 2008-0055, unpub. (La.App. 4 Cir. 1/14/08).

. State v. Williams, 2009-1093, unpub. (La.App. 4 Cir. 8/20/09).

. State v. Williams, 2009-1542, unpub. (La.App. 4 Cir. 11/30/09), writ denied, 2009-2825 (La.1/29/10), 25 So.3d 818.

. State v. Williams, 2010-0867, unpub. (La.App. 4 Cir. 6/18/10), writ denied, 2010-1428 (La.6/18/10), 38 So.3d 333.

. State v. Williams, 2010-1010, unpub. (La.App. 4 Cir. 7/19/10), writ denied, State ex rel. Williams, 2010-1791 (La.8/19/11), 67 So.3d 1261.

. State v. Williams, 2011-0248, unpub. (La.App. 4 Cir. 2/23/11).

. Initials of the victim and, where appropriate, the initials of others, such as the victim’s family members, will be used to protect the identity of the minor crime victim.

. F.R.E. 803(4) states:
The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
[[Image here]]
(4) Statement Made for Medical Diagnosis or Treatment. A statement that:
(A) is made for — and is reasonably pertinent to-medical diagnosis or treatment; and
(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

. T.W.2 later clarified on cross examination that she did not mean a VCR itself, but only VCR videotapes.