TERRI F. LOVE, Judge.
12Dameion Greenberry (“Mr. Greenber-ry”) appeals his conviction of sexual battery, a violation of La. R.S. 14:43.1(0(2), and contends that (1) the trial court erred by introducing inadmissible hearsay; (2) the trial court erred when it allowed the State to introduce other crimes evidence; and (3) he was deprived a fair trial due to prosecutorial misconduct during closing arguments. We find that Mr. Greenberry’s statement was admissible pursuant to La. C.E. art. 801(D)(2)(a) as a personal admission and therefore the trial court did not err. We also find the trial court did not abuse its discretion in allowing the State to introduce evidence that Mr. Greenberry violated a protective order as its probative value outweighed any prejudicial effect. Furthermore, this Court finds the prosecutor’s comments do not merit a reversal of Mr. Greenberry’s conviction and sentence, as Mr. Greenberry failed to show any reasonable likelihood that the comments influenced the verdict in this case. Accordingly, we affirm.

PROCEDURAL HISTORY

In July 2011, the- State indicted Mr. Greenberry with one count of sexual battery, a violation of La. R.S. 14:43.1(0(2) and one count of aggravated rape, a | .¡violation of La. R.S. 14:42(A)(4). Thereafter, the State filed its notice of intent to offer “other crimes” evidence.
In July 2013, the State elected to proceed to trial on the sexual battery charge only. At the conclusion of a two-day trial, the twelve-member jury unanimously found Mr. Greenberry guilty as charged.
In November 2013, the trial court sentenced Mr. Greenberry to forty-five years at hard labor, with the first twenty-five years to be served without benefit of parole, probation or suspension of sentence, sentence to be served concurrently with any other sentence, with credit for time served. Also on this date, the defense filed its motion for appeal, and the motions for new trial and reconsideration of sentence were denied.

FACTUAL BACKGROUND

Mr. Greenberry was charged with the sexual abuse of his live-in girlfriend’s ten year old[1] daughter, J.W.[2] The incident *704 which triggered this prosecution occurred in April 2011, when Mr. Greenberry inserted his finger into the victim’s vagina.
Testimony of Victim’s Mother
L.T., the victim’s mother, testified that in addition to the victim, she also had an eight year old son, J.W. L.T. stated that Mr. Greenberry was her ex-boyfriend, |4and that she, the victim, and J.W. moved into his house in 2009. The house had two bedrooms. L.T. and Mr. Greenberry shared one, and the victim and J.W. occupied the other. L.T. said that in 2010, the victim told her that Mr. Greenberry touched her inappropriately. L.T. and the victim confronted Mr. Greenberry with the victim’s accusation, after which she and her children moved into an apartment. Sometime after the move, the victim recanted her accusation against Mr. Green-berry. Shortly after, L.T., the victim and J.W. returned to live with Mr. Greenberry. At that time, L.T. said she was employed, working an early morning shift, and that Mr. Greenberry was unemployed.
L.T. recalled that on April 3, 2011, she left the residence between five and six in the morning to report to work and returned about one or three in the afternoon. In speaking with the victim that afternoon, L.T. learned that the victim and Mr. Greenberry had been in Mr. Greenberry’s bed watching the television. The victim then told her that Mr. Greenberry “had touched her down there.” When L.T. confronted Mr. Greenberry, he told her he did not remember touching the victim. A few days later, the victim told L.T. that the first time Mr. Greenberry touched her, he performed oral sex on her. The victim also informed her that the April B, 2011 incident[3] was the second time Mr. Green-berry touched her and that he digitally penetrated her vagina.
|SL.T. testified that she took the victim to the Child Advocacy Center[4] and met with Ann Troy (“Ms. Troy”), a forensic nurse practitioner specializing in child abuse. L.T. recalled telling Ms. Troy that with regard to the victim’s accusation, Mr. Greenberry said: “It could be true. I was high on drugs. I don’t remember.”
On cross-examination, L.T. denied ever telling Ms. Troy that the victim told Mr. Greenberry to stop, but that he put his leg over her and his hand on her head to restrain her as he touched her. L.T. also denied telling the authorities that the victim told her Mr. Greenberry ordered the victim to roll around on him. Further, L.T. did not remember telling the authorities that the victim said when J.W. entered Mr. Greenberry’s bedroom, the victim followed J.W. back to their bedroom.
When asked about her feelings towards Mr. Greenberry, she stated she was conflicted and that she still had feelings for him. After Mr. Greenberry’s arrest on this charge, he telephoned her from jail, and the two spoke on more than one occasion. L.T. also said that on at least one occasion when Mr. Greenberry phoned her, he asked to speak with the children. L.T. admitted that after Mr. Greenberry’s arrest, she and the victim paid a visit to his then-attorney. The attorney met with *705 the victim alone for a few minutes, after which L.T. entered the room. After the attorney visit, Mr. Greenberry continued to telephone her from jail, and when he did, he asked to speak to the victim; however, she could not recall the victim | f,speaking to him. L.T. said that she still had feelings for Mr. Greenberry, even at the time of trial.
On cross-examination, L.T. remembered meeting with the defense team’s investigator and telling him that she was abused as a child by her mother’s boyfriend.
On re-direct examination, L.T. said that she did not remember Mr. Greenberry blaming the 2011 incident on his being high on drugs. She explained that the notation in Ms. Troy’s notes was her (L.T.’s) comment, not Mr. Greenberry’s.
Testimony of Ann Troy
As part of the NOPD’s investigation, the victim and her younger brother gave recorded statements to the CAC. Ms. Troy, a forensic nurse practitioner specializing in child abuse, interviewed the victim in this case. At trial, Ms. Troy identified the victim’s Children’s Hospital medical records which included an emergency room record for the victim indicating that she was seen on April 5, 2011, noting that the victim presented with the complaint that her stepfather digitally penetrated her vagina two days prior, and that she experienced pain upon urinating. The emergency room personnel performed STD screening — HIV, syphilis, gonorrhea and chlamydia — and assessed the victim’s genital urinary area. Based upon the victim’s complaints, the emergency room personnel contacted the NOPD and Child Protection Services. Thereafter, the victim was referred to |7Children’s Hospital, where Ms. Troy met with the victim in May 2011. Ms. Troy recorded her interview with the victim which was played for the jury.
Ms. Troy indicated at trial that she concluded that the victim gave clear, detailed, spontaneous information about how Mr. Greenberry digitally penetrated her vagina. Ms. Troy did not detect any deception on the part of the victim. The physical examination performed by Ms. Troy indicated normal findings of the victim’s genital area. She explained that the finding was not unusual in this type of sexual abuse, as a child’s body quickly repairs itself.
After interviewing the victim, Ms. Troy spoke to the victim’s mother to gather what information she had concerning the incident.
After the victim’s mother testified, the State recalled Ms. Troy as a rebuttal witness. Ms. Troy indicated that part of her assessment of child abuse is speaking with the parent or guardian who presented the child for assessment. In this case, Ms. Troy spoke with the victim’s mother, out of the victim’s presence. She identified the notes she took during her conversation with the victim’s mother. The notes indicated that the victim’s mother told Ms. Troy that the victim told her that Mr. Greenberry inserted his finger into her vagina, and that he was sweating profusely when doing so. Further, Ms. Troy’s notes indicated that when she asked the victim’s mother what she did in reaction to the victim’s admission, the mother indicated that she confronted Mr. Greenberry and that he said: She’s probably not lying, but I don’t remember. “Did cocaine.”
| ¿Testimony of the Victim
At trial, the victim testified that J.W. was her younger brother; L.T. was her mother; and that the three of them no longer lived with Mr. Greenberry. She identified Mr. Greenberry as a friend of her mother and said that she, J.W. and L.T. lived with Mr. Greenberry in his *706 house for a while. The victim testified that Mr. Greenberry and L.T. shared a bedroom, and the victim and J.W. slept in another bedroom.
When questioned about what happened to her, the victim stated: “I don’t feel comfortable saying it.” The victim remembered going to the CAC and speaking with someone there, and that the conversation was recorded. The State played the recording during which the victim identified herself. Further, she said that everything she said on the recording was true. After playing the interview for the jury, the State asked the victim what happened to her while she and her family lived with Mr. Greenberry. She responded that “something happened twice.”
She explained that the second incident occurred when she and Mr. Greenberry were in his bed under .the covers. Again, the victim could not verbalize what happened to her but did say that after it happened, she felt mad. With regard to the first incident, the victim stated she and Mr. Greenberry were in the kitchen. On that occasion, she told her mother what happened, and her mother was angry, spoke to Mr. Greenberry, and thereafter took her to the hospital. The victim recalled telling someone that the first incident did not happen but also said that was a lie. She explained that she told the lie because she wanted her mom and | nbiological father back together. The victim said that after the first incident, her mom was sad and crying, which upset her.
During cross-examination, the victim testified that after she told her mother what happened between her and Mr. Greenberry in the kitchen, she and her brother moved to their grandmother’s house for a while before returning to Mr. Greenberry’s house.
Testimony of Victim’s Brother
J.W., the victim’s eight year old brother, testified that Mr. Greenberry was his “stepfather.” He said that although he, his mother and the victim did not live with Mr. Greenberry at the time of trial, they had resided at his house for a few months. J.W. said he saw the victim and Mr. Greenberry in Mr. Greenberry’s bed on one occasion, and he said he thought that was weird because Mr. Greenberry was a grown man, while the victim was just a little girl.
The State then played J.W.’s interview conducted at the CAC wherein he explained to the interviewer that he witnessed his sister and-Mr. Greenberry in the bed together on the date of the incident.
Under cross-examination, J.W. testified that the day he saw the victim and Mr. Greenberry in bed, Mr. Greenberry was at the head of the bed, and the victim was at the foot of the bed. As J.W. left Mr. Greenberry’s bedroom, the victim got up and followed him into their bedroom.
| inTestimony of Mr. Greenberry
The defense called Mr. Greenberry to testify. L.T. and her two children lived with Mr. Greenberry in his house for approximately two years and were engaged to be married at one time. During the time L.T. and her children lived with him, the children viewed him as a father figure. He played with the children, did laundry and cooked for them. He said he was shocked when L.T. confronted him about the victim’s claim that he had abused her. He even requested that L.T. take the victim to the hospital for testing to disprove the accusation. He recalled that L.T. had mentioned to him that as a child she was sexually abused by her mother’s boyfriend, and that she frequently counseled the victim about what she should do if she were touched inappropriately.
*707 Mr. Greenberry testified that he attended a family party until the early morning hours on the day of the incident and had been drinking. When he returned home, L.T. was preparing to leave for work, and she told him he would have to babysit her children. On that day, J.W. was punished and could not watch television, so Mr. Greenberry told the victim she could watch television in his room, which she did.
Referencing the jailhouse calls played for the jury, Mr. Greenberry acknowledged that on one of the calls he is heard to ask his mother to retrieve his gun. He stated he was concerned that the weapon might be stolen from his house during his absence. He said that during one call, he told his mother he was on drugs on the date of the incident, but that he was referring to his dependency onJ^Vicodin as a result of a knee injury. He further testified that his comment during one of the calls, that it was his fault not L.T.’s, referred to his bad habits, none of which L.T. shared. He also admitted lying to the police about his address when they contacted him to set up an appointment to speak with him. He explained that he just moved into his house and wanted to make sure it was presentable before he met with officers. Finally, he emphatically denied abusing the victim.
On cross-examination, Mr. Greenberry identified an Order of Protection bearing his signature, mandating that he not contact the victim or the victim’s family. He testified that he spoke with L.T. several times from jail and may have asked to speak with the victim, but he denied ever speaking with her. The State played a portion of Mr. Greenberry’s jailhouse calls in which he called L.T. a couple months prior to trial and told her to put the children on the phone.
Testimony of Magistrate Commissioner Robert Blackburn
The State then called Magistrate Commissioner Robert Blackburn as a rebuttal witness, who testified that one of his duties was authorizing the issuance of orders of protection. In the course of issuing a protective order, Commissioner Blackburn testified that he reviews with an accused the restrictions imposed by the protective order. The magistrate identified the protective order he signed in this case mandating that Mr. Greenberry have no contact with the victim or the victim’s mother, and that he not possess a firearm. He noted Mr. Greenberry’s signature on the fourth page of the order.
1 ^During cross-examination, Commissioner Blackburn explained that a stay-away order is issued for six months duration. He noted that the order in Mr. Greenberry’s case expired in December 2011, but he indicated that stay-away orders are usually intended to remain in effect until the resolution of a criminal prosecution.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

INADMISSIBLE HEARSAY

In his first assignment of error, Mr. Greenberry contends the trial judge abused her discretion by allowing the State to introduce inadmissible hearsay. Mr. Greenberry objects to the introduction of Ms. Troy’s unredacted report in which she made a handwritten notation that the victim’s mother said Mr. Greenberry told her: “[The victim’s] probably not lying [about the incident]. But I don’t remember. Did cocaine.”
Prior to trial, the defense filed a motion in limine, urging among other things, that the State be prohibited from introducing *708 any physical or testimonial evidence regarding any rumors or innuendos concerning Mr. Greenberry’s past use of cocaine. To that end, the defense sought redaction of those portions of the victim’s medical reports referencing Mr. Greenberry’s drug use, in this case Ms. Troy’s handwritten notation.
At the pre-trial hearing on the defense motion, the State argued that it intended to introduce the statement as both proof of Mr. Greenberry’s state of mind |iaand as inculpatory evidence. Further, the State argued that it had provided the defense with notice pursuant to La.C.Cr.P. arts. 767 and 768. The trial judge denied the motion in limine and noted that she “perceive[d Ms. Troy’s notation] as a' double hearsay issue.”
On appeal, Mr. Greenberry claims that because Ms. Troy’s handwritten notation was not related to medical treatment or diagnosis, nor introduced as a statement against interest, and because his admission as to the use of drugs and that he could have abused the victim is not corroborated by any other evidence as required by La. C.E. art. 801(D)(1)(a), the notation was inadmissible hearsay.
Hearsay is defined by La. C.E. art. 801(C) as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” Generally, pursuant to La. C.E. art. 802 hearsay is excluded, “unless specifically provided by the Code of Evidence or other legislation ... because the value a jury places on a statement depends upon its declarant, and the defendant cannot challenge the declarant’s credibility by cross-examination or other safeguards of reliability if the declarant is not present at trial.” State v. Smith, 11-0091, p. 13 (La. App. 4 Cir. 7/11/12), 96 So.3d 678, 687; State v. Martin, 458 So.2d 454, 460 (La. 1984).
“A trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion.” State v. Cyrus, 11-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565. Also, “[a] trial court is vested with much discretion in determining whether the probative value of relevant evidence is 114substantially outweighed by its prejudicial effect” under La. C.E. art. 403. State v. White, 09-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204.
A defendant’s own statement is not hearsay. See State v. Strickland, 94-0025, p. 22 (La.11/1/96), 683 So.2d 218, 229. In this case, L.T. initially testified that Mr.. Greenberry made the statement to her, and that she in turn relayed the information to Ms. Troy. Ms. Troy testified that L.T. told her that Mr. Greenberry made this admission. Mr. Greenberry’s statement was admissible under La. C.E. art. 801(D)(2)(a)[5] as a personal admission. He testified at trial and denied making the statement. The complained-of testimony was not hearsay.
Nevertheless, even if the admission of the statement was erroneous, the admission of hearsay testimony is subject to a harmless error analysis. State v. Hugle, 11-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613, citing State v. *709 Wille, 559 So.2d 1321, 1331 (La.1990). The test for determining harmless error is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, in other words, was the guilty verdict actually rendered unattributable to the error. See Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
On appeal and review of the record in this matter, even in the absence of the handwritten notation, there was sufficient evidence to convict Mr. Greenberry. | isL.T. testified that the victim complained to her that Mr. Greenberry digitally penetrated her vagina. The victim testified that Mr. Greenberry abused her, and she verified that the recording of her CAC interview was correct. J.W., the victim’s younger brother, corroborated that the victim and Mr. Greenberry were in bed together the day the incident occurred. In light of the evidence of Mr. Greenberry’s guilt, it is unlikely the complained-of- admission contributed to the jury’s verdict of guilty. This assignment of error is merit-less.

PRIEUR EVIDENCE

Additionally, Mr. Greenberry avers that the trial court impermissibly allowed the State to introduce “other crimes” evidence, specifically that Mr. Greenberry violated a protective order when he telephoned the victim’s mother from jail. Mr. Greenberry contends that the prohibition against his contacting the victim’s mother was a stay-away order instituted as a condition of bail, enumerating his obligations upon release from pretrial custody, which ultimately did not occur. He also argues that the order expired .prior to the time he contacted L.T., asking to speak to the children.
Generally, evidence of other crimes, wrongs, or acts committed by the defendant is inadmissible due to the “substantial risk of grave prejudice to the defendant.” State v. Prieur, 277 So.2d 126, 128 (La.1973). Under La. C.E. art. 404(B)(1), however, such evidence may be admitted for the purpose of showing “motive, opportunity, intent, preparation, plan, knowledge.... ” Evidence of other bad acts is not admissible simply to prove the bad character of the accused. La. |1fiC.E. art. 404(B)(1). Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Hatcher, 372 So.2d 1024, 1033 (La.1979).
Although a criminal defendant’s prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. “The probative value of the evidence must outweigh its prejudicial effect of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” State v. Henderson, 12-2422, p. 2 (La.1/4/13), 107 So.3d 566, 567-568.
“A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” State v. Henry, 11-1137, p. 9 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1022 writ denied, 12-2520 (La.4/26/13), 112 So.3d 838. “A trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion.” State v. Williams, 12-0252, p. 20 (La.App. 4 Cir. 4/17/13), 115 So.3d 600, 611. Neither of Mr. Greenberry’s arguments under this assignment is persuasive. The docu *710 ment at issue is styled “Uniform Abuse Prevention Order”, and its purpose is clearly indicated to be prevention of abuse of the victim. The fact that the order also places restrictive conditions upon Mr. Greenberry in the |17event of release on bail is an extension of its protective intent. So long as Mr. Greenberry remained in custody, a “protective order” was not necessary. Moreover, nothing in the order, contrary to Mr. Greenberry’s contention, leads this Court to conclude that the recited restrictions were applicable only upon Mr. Greenberry’s release from custody. The stay-away order instituted as a condition of bail was sufficient to constitute a protective order under La. R.S. 14:79(A)(3). Under this portion of La. R.S. 14:79, there were no requirements for the entry or registry of an Abuse Prevention Order. The evidence shows that Mr. Greenberry had notice that he was under a court order to stay away and refrain from contacting the victim, and that he violated that order.
Mr. Greenberry’s claim that he did not contact L.T. until after the order expired in December 2011, is not supported by the record. Though she could not specify dates and times, L.T. did verify that Mr. Greenberry called her after his arrest and asked to speak to J.W. and the victim. Moreover, when asked about such calls, Mr. Greenberry did not deny making them. Instead, he stated: “I might have [done so].”
Even if the trial court erred in admitting evidence of “other crimes” or “bad acts”, the erroneous admission of other crimes evidence is subject to a harmless-error analysis. See State v. Maise, 00-1158, p. 8-9 (La.1/15/02), 805 So.2d 1141, 1147-48. An error is harmless if the jury’s verdict actually rendered at trial was “surely unattributable to the error.” Sullivan, 508 U.S. at 279, 113 S.Ct. at 2081.
|1sAs discussed previously, there was substantial evidence of Mr. Greenberry’s guilt for the sexual battery of a juvenile in this case, and the evidence concerning the protective order did not contribute to the verdict. This assignment is without merit.

PROSECUTORIAL MISCONDUCT

In his final assignment, Mr. Greenberry claims he was deprived of a fair trial because of prosecutorial misconduct during closing argument. The scope of closing arguments of either defense counsel or the State, as provided in La. C.Cr.P. art. 774, shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and the law applicable to the case. The argument shall not appeal to prejudice. The State’s rebuttal shall be confined to answering the argument of the defendant.
In reviewing claims of improper arguments, Louisiana jurisprudence maintains that a prosecutor has wide latitude when making closing arguments, and that the trial court has broad discretion in controlling the scope of those arguments. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036. “[E]ven if the prosecutor exceeds these bounds, the court will not reverse a conviction unless ‘thoroughly convinced’ that the argument influenced the jury and contributed to the verdict.” Id., 99-0023, p. 17, 775 So.2d at 1036. “[P]rosecutorial misconduct must be so pronounced and persistent that it casts serious doubts upon the correctness of the jury’s verdict.” United States v. Rodriguez, 43 F.3d 117,124 (5th Cir.1995). The “reviewing court should accord credit to the good sense and fair-mindedness [19of the jury that heard the evidence.” Henry, *711 11-1137, p. 15 (La.App. 4 Cir. 10/24/12), 102 So.Sd 1016,1025.
Mr. Greenberry cites three instances of alleged prosecutorial misconduct during closing argument. He claims the prosecutor prejudicially referred to him as a “predator” and repeatedly told the jurors that they were “the only ones who could protect the victim from' the defendant.” The following occurred during closing arguments:
ADA: ... [the victim] goes to her mother when she was nine years old and says, [the defendant] touched me in my private part. Cries out to her mother. Her mother doesn’t protect her, but takes her in front of this predator ... Defense: Objection. Improper close is a violation of Article 774.
Court: Objection overruled.
ADA: Takes her in front of that predator and told her to repeat what she had just said. She goes and cries to somebody she thinks is going to protect her, but doesn’t get that protection.
ADA: ... and you heard from Ann Troy the cyclical sad nature of molestation. It is not a surprise to me that her mother chose to date a child predator. Defense: Objection ... violation of [La. C.E. art.] 774 ...
Court: Overruled.
ADA: It is absolutely no surprise that her mother went into the arms of a child predator. Having gone through this ... Defense: Renew objection ...
ADA: ... And, ladies and gentlemen. I go back to [the victim’s mother] because she is really part of the sad story for [the victim]. She is a woman who thinks that she protects her children. Yet you saw (sic) the testimony, the' victim cried out to her once. She should have known as a child abuse victim herself that that was enough. But she kept her child in the home_with a predator.
| j>ftADA: ... Momma’s not the one who called the police. Momma didn’t want her boyfriend arrested. I played a jail call for you from two months ago when she’s on the phone telling [the defendant]that [she] loves him. There really is no one left to protect this child.
And I’m speaking to all the mothers on this jury today. You in your gut know that [the victim’s mother] is not going to protect this child from [the defendant]. Each and every one of you mothers know that. There is no one left to protect this child but the thirteen of you are the only things that stand between [the victim] and [the defendant]. The thirteen of you are the only ones that can keep [the defendant] away from [the victim].
He is a man who was drug raged that April 3, 2011, morning on cocaine, had gone out drinking all night -long, had come home and saw his opportunity to do what he did. And this is a man that ... [the victim’s mother] said she still loved.
Ladies and gentlemen, the case is yours now. It is your duty to reach a verdict in the case. And as I indicated that the thirteen of you are now the sole protectors of. [the victim]. You all decide [the defendant’s] fate. But you also decide [the victim’s] fate.
After the prosecution completed its closing argument, the defendant moved for mistrial based on the foregoing comments. Upon motion of a defendant a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it “impossible for the defendant to obtain a fair trial.” La.C.Cr.P. art. 775. However, a “[m]istrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La.C.Cr.P. art. *712 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Burton, 09-0826, p. 10 (La.App. 4 Cir. 7/14/10), 43 So.3d 1073, 1080 (quoting State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768). “[A] trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial.” State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. A trial court’s decision as to whether actual prejudice has occurred and whether a mistrial is warranted will not be overturned on appeal absent an abuse of that discretion. State v. Maxwell, 11-0564, p. 25 (La.App. 4 Cir. 12/21/11), 83 So.3d 113, 128.
121Mr. Greenberry cites State v. Moore, 414 So.2d 340, 347 (La.1982), as support for his argument that the prosecutor’s argument in this case, that the jury was responsible for protecting the life of the victim and so the jury should vote guilty, was improper and entitled him to a mistrial.
In Moore, the prosecutor stated:
... Today we’re here also to protect the innocence and the future victims of crime. Dennis Sloan is not an innocent person, neither is Arthur Stewart, Jr. and by no means is this defendant today, Alvin R. Moore, Jr. Let’s not forget who is the innocent party in this case. It’s Jo Ann Wilson, her child, Regina, her husband, Aaron, her mother and father and sister. They are the innocent victims of this tragic and terrible crime. Let’s not forget about these people because that’s what justice is about, not to forget about them.
She’s the innocent victim of this crime. And justice requires that you vote guilty and you vote for life when you do. The life of every one of us to walk the streets from this type of people. We’re voting for our lives, the lives of our families to be free from this type of activity. Thank you.
Although the foregoing comments are similar to those made by the prosecutor in this case, and the Supreme Court in Moore noted: “A prosecutor should avoid remarks predicting societal costs and consequences of a not guilty verdict”, the court concluded that in light of the overwhelming evidence of Moore’s guilt, it was unlikely the prosecutor’s argument contributed to the verdict. Id., 414 So.2d at 347. Similarly, the evidence of Mr. Greenber-ry’s guilt is overwhelming, and he failed to show how the prosecutor’s argument contributed to the verdict.
In Henry, supra, this Court held that the prosecutor’s reference to the defendant as a predator did not rise to the level of prosecutorial misconduct. Moreover, in State v. Kennedy, 05-1981 (La.5/22/07), 957 So.2d 757, the ^defendant argued that the prosecution made inappropriate comments during closing: (1) asking the jury to convict the defendant to protect the victim, and (2) calling the defendant a monster. The Supreme Court concluded that those remarks did not influence the jury or contribute to the verdict.
In the instant case, the bulk of the State’s arguments were fair statements of the evidence admitted and the lack of evidence to corroborate the defense’s theory of the case. Reading the prosecutor’s argument as a whole, and considering the entirety of the record, nothing Mr. Green-berry claims indicates that these remarks so influenced the jury that they contributed to the verdict. Given the traditional breadth accorded the scope of closing arguments by this Court, none of the comments would either individually or collectively merit reversing Mr. Greenberry’s conviction and sentence. See State v. Bridgewater, 00-1529, p. 33 (La.1/15/02), *713 823 So.2d 877, 903 (“animal” and “coldblooded killer” on the hunt for prey did not contribute to the guilty verdict). Because Mr. Greenberry failed to show any reasonable likelihood that the prosecutor’s comments influenced the verdict in this case, this assignment has no merit.

DECREE

For the foregoing reasons, we affirm Mr. Greenberry’s conviction and sentence.
AFFIRMED.

. The victim’s date of birth is September 24, 2000.

. The ten year old victim will be referred to herein as the "victim” to protect her privacy. *704 See Rule 5-2 of the Uniform Rules — Courts of Appeal. Additionally, the victim's eight year old brother and the victim’s mother will also be referred to by their initials. J.W. and L.T., respectively, to protect their privacy.

. The incident occurring on April 3, 2011, is the subject matter of the present appeal.

. The Child Advocacy Center ("CAC”) is an organization that performs forensic interviews in child abuse cases. The CAC conducts the forensic interviews in a child-friendly environment to limit the number of times the child is interviewed by authorities and exposed to trauma during the investigative process.

. La. C.E. Art. 801(D)(2)(a) provides in pertinent part:
Statements which are not hearsay. A statement is not hearsay if ... [i]n a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness’ attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.