SANDRA CABRINA JENKINS,
Judge.
[ 1 Jamiron and Bernell Pollard appeal their convictions and sentences for one count of second degree murder and two counts of attempted second degree murder. For the following reasons, we affirm the defendants’ convictions and sentences as amended and remand the case to the trial court for correction of the sentencing minutes and the order of commitment. ■
FACTUAL AND PROCEDURAL BACKGROUND
On September 26, 2010, a shooting occurred at a second line parade in uptown New Orleans, Louisiana. Jeremy Galmon, a two-year old attending the parade, sustained a fatal gunshot wound to the head. Multiple gunshots were fired at a passing vehicle, but its two occupants, Sean Briggs and Sedale Dorsey, escaped injury. Several witnesses identified Jamiron and Ber-nell Pollard,[1] the defendants, as the shooters. Accordingly, the State obtained an indictment charging the defendants with the second degree murder of Jeremy Gal-mon and the attempted second degree murders of Sean Briggs and Sedale Dorsey, which the defendants entered not guilty pleas to all three counts. The trial court subsequently denied the defendants’ motions to quash and their motions to suppress the evidence and identification.
| ¡«.Trial commenced, and after four days, the jury found the defendants guilty as charged on all three counts. The defendants then filed motions for a new trial, which the trial court denied. Thereafter, the defendants were sentenced on the second degree murder count to life imprisonment without benefit of parole, probation, or suspension of sentence and fined $276.50. As to each attempted second degree murder count, the defendants were sentenced to fifty years at hard labor, all to run concurrent with each other. The defendants timely noticed their intent to appeal their convictions and sentences.
The testimony and evidence adduced at trial is as follows.
Joyce Galmon, the grandmother of two-year-old Jeremy Galmon, was attending the second line parade with family members on September 26, 2010. Joyce stated that she was playing with her three grandchildren in the car, parked near First and Dryades Streets, when she heard what sounded like a balloon pop, followed by the sound of several gunshots. Immediately after hearing the gunshots, the back windshield of the car shattered, and she grabbed Jeremy, who was standing on the backseat facing the rear. Joyce stated that she yelled for help when she noticed that Jeremy’s face was covered in blood and her son transported Jeremy to the hospital. Joyce recalled that a white or silver car sped by just as the shooting began, but she could not see who was in the car or who was firing the shots.
Delaaronia Galmon, the mother of Jeremy, informed the jury that she participated in the second line with her marching club, the Uptown Swingers Second Line Club. Delaaronia confirmed that her son attended the parade with her mother. De-laaronia stated that when her marching club arrived at Second and Dryades Streets, she heard three to four gunshots and dropped down for cover. When the gunfire stopped, Delaaronia received a phone call from her uncle saying | sthat her son had been shot. Delaaronia testified *294 that she ran to the location of the shooting where she was told her son was already at the hospital. Delaaronia stated that she immediately went to the hospital, but was not permitted to see her son. Delaaronia testified that she was around the corner when the shooting occurred so she did not see who shot her son.
Ashley Booker testified that she attended the second line parade with, among others, her child and Joyce Galmon. Ms. Booker stated that they parked near the intersection of First and Dryades Streets and caught the parade around Second Street. Ms. Booker testified that her child stayed in the vehicle with Ms. Galmon and Ms. Galmon’s grandchildren, Jeremy and Jeniah. Ms. Booker recalled that as she was walking back to the vehicle sometime later, she heard gunshots and then witnessed two black males, one at the front and one at the rear of the vehicle, shooting at each other. According to Ms. Booker, both of the gunmen wore black shirts, she did not recognize either of them, and they both ran away as she got closer. Ms. Booker stated that she gave a statement to the police at their headquarters later that evening.
Dorimekka Nicholas testified that while she and her family were getting back into the vehicle to leave the parade, she heard at least ten gunshots fired and immediately ducked her head. Dorimekka stated that she then saw three men walking up, dressed in all black — one was tall and skinny, had twists in his hair, and was wearing a hat and blue boxers; and another was heavyset. She observed the skinny male fire a silver and black gun at a Chevrolet Impala driving by. Later that evening, Dorimekka went to police headquarters and gave a statement.
Tracy Nicholas testified that as she and her family members got into their car to leave the parade, she heard four gunshots fired before she put the keys into the ignition. Tracy testified that after the gunshots, she looked up and saw two | ¿black males — both wearing all black and one holding a silver and black gun. Tracy gave a statement at police headquarters later that evening, and the police came to her office the next day to conduct a photographic line-up.
Ashley Nicholas testified that before she exited the vehicle to watch the parade, she noticed two black males, both dressed in all black, walking towards the second line parade. According to Ashley, one of the males, who wore his hair in “dreads,” stopped and gave a hug to a female acquaintance as they walked by. Ashley stated that when she later got into the car after the parade, she heard five or six gunshots; when the firing stopped, Ashley looked up and saw the two black males whom she had observed walk by earlier. Ashley informed the jury that she saw the male with the dreads fire his gun at a white or gray Chevrolet Impala driving on First Street. Ashley stated that the second male was also armed and was shooting as well. Ashley testified that she went to the police station on the evening of the shooting and gave a recorded statement and descriptions of the shooters to help the police compose sketches.
Ursula Nicholas testified that after attending the second line parade, she heard many shots and recalled seeing two black men at the scene — one was tall and had his hair in dreads, and the second was short. Ursula testified that she observed the tall male firing a silver gun at a passing car. Ursula stated that she gave a statement to the police the day after the shooting and selected the picture of the person she saw shooting when presented with a photographic line-up.
*295 Sean Briggs testified[2] that he and Sedate Dorsey were driving around uptown New Orleans in a silver Chevrolet Impala on September 26, 2010. Briggs recounted that as they drove up to the intersection of First and Dryades Streets, he |scould tell that gunshots were fired by the reaction of the people in the vicinity and the car windows shattering, but could not hear the shots because he had loud music playing in his car. Briggs stated that he attempted to speed from the area, but his vehicle stalled when it reached Baronne Street.
In response to several calls to 911 about the shooting, Officer Robert Barrere and his partner were en route to the crime scene when it was dispatched that the perpetrators fled in a blue Chevrolet Impala. Immediately after hearing that description, the officers noticed the suspects’ car approaching them on Jackson Avenue headed toward Claiborne Avenue with three or four black mates in the vehicle. Officer Barrere made a U-turn behind the vehicle, and followed it onto First Street. He eventually lost sight of the vehicle, which was traveling at speeds of eighty miles per hour in a residential neighborhood, after it ran two red lights. After the chase, Officer Barrere and his partner relocated to the crime scene to assist in the investigation.
Detective Robert Long, the lead investigator in this ease, met the witnesses and family members at the hospital to initiate his portion of the investigation. After his investigation at the hospital, Det. Long asked the witnesses to relocate with him to the Homicide Office so that he could obtain formal statements pertaining to the offenders. Ashley Nicholas, Ashley Booker, Dorimekka Nicholas, Tracy Nicholas, and Ursula Nicholas all relocated to the Homicide Office to give recorded statements wherein they each separately described the shooters as two black mates, both dressed in all black, and one with dreadlocks or a short twist style.
| fiDet. Long met with Ashley, Dorimek-ka, Tracy, and Ursula Nicholas a second time. Separately, Det. Long presented each witness with a six-person photographic line-up, which contained a picture of one of the defendants amongst five other photographs.. Ashley, Dorimekka, and Tracy did not identify a defendant, but Ursula positively identified the defendant that appeared in her line-up, which was Bernell.
Det. Long obtained statements from Sedate Dorsey[3] and Sean Briggs, occupants of the vehicle shot at by the defendants, on the evening of the incident. Dorsey and Briggs, who was arrested and charged with being a felon in possession of a firearm on the night of the shooting, were both uncooperative. Det. Long followed-up with a call to Dorsey two days after the incident, which resulted in a second meeting at Dorsey’s request. During this meeting, Dorsey identified the shooters by name as Jamiron and Bernell Pollard,[4] and *296 selected both defendants in photographic line-ups. In response to learning these names, along with the information that the gunmen fled in a blue Chevrolet Impala, Det. Long checked an internal database, which is composed of vehicles that have recently been stopped by the police for various reasons. The search revealed that "Bernell Pollard was an occupant in a 2005 blue Chevrolet Impala that was stopped about a month prior to |7the shooting.[5] Det. Long then obtained arrest warrants for the defendants, and they were apprehended thereafter.[6]
After the defendants were arrested, Briggs contacted Det. Long to request a second meeting. Present for the meeting was a representative from the Orleans Parish District Attorney’s office, Det. Long, Briggs, and Briggs’ attorney. The meeting occurred on October 28, 2010, a little more than one month from the initial incident, and a court reporter was present to record and transcribe Briggs’ statement. During his formal statement, Briggs identified the shooters as Jamiron and Bernell Pollard[7] and selected both defendants in photographic line-ups.
Detective Ryan Aucoin testified that he did not respond to the scene until the incident had been upgraded to a homicide, and when he arrived, the crime lab had already begun photographing and collecting bullet casings. Det. Aucoin indicated that a nearby 2010 Chevrolet Impala and a green or blue Sport Utility Vehicle (“SUV”) were believed to have been involved in the shooting. ■ The Chevrolet Impala had several bullet holes and extensive body damage on the passenger side, and the SUV exhibited damage on the driver side. Det. Aucoin stated that the bullet casings gathered from the scene revealed that two weapons were used in the shooting — a .45 caliber gun and a 9mm gun. While on the stand, Det. Aucoin identified a photograph of the underneath portion of a house in the area of the crime scene, which depicted a concealed firearm, and another photo, which was a |Rclose-up of the firearm once it was removed. Det. Aucoin stated that the firearm retrieved from under the house was a Smith & Wesson 9mm handgun.
Officer Troy Dickerson processed and tested two Chevrolet Impalas recovered from the crime scene. An examination of the first Impala revealed one copper-jacketed pellet in the interior trunk of the vehicle, and the second Impala revealed one copper-jacketed pellet in the front passenger side door frame and two copper-jacketed fragments and two lead fragments in the trunk of the car.
Meredith Acosta, an expert in ballistic and firearms identification, testified that the evidence recovered and examined included: (1) a Smith & Wesson 9mm semiautomatic pistol, (2) a dock 9mm semiautomatic pistol, (3) eighteen 9mm caliber cartridge cases from the crime scene, and (4) seven .45 caliber cartridge cases from the crime scene. Ms. Acosta stated that *297 her examination revealed that the eighteen 9mm. cartridge cases were all fired by the same weapon, but they did not match either of the 9mm semi-automatic pistols recovered.
The defendants did not testify at trial. Instead, the defendants called Janice Cel-estine and Pamela Benoit as witnesses on their behalf. Ms. Celestine testified that after attending the second line parade, she heard five to six gunshots and ducked into the alley of a nearby building. Ms. Celes-tine stated that once the gunfire stopped, she peered out of the alley and saw a thin male, about 6'2" tall, wearing dark-colored clothing, running towards St. Charles Avenue with a gun. Ms. Celestine stated that she has known the Pollards for years and that the man she saw running from the crime scene was neither Jamiron nor Ber-nell. Ms. Celestine stated that she called Crimestoppers on the evening of the shooting, but admitted to otherwise making no effort in contacting the police.
Ms. Benoit testified that she was standing on the corner of Second and Dryades Streets entering a bar when she heard numerous gunshots. Ms. Benoit |sstated that when she looked in the direction of the shooting, she saw a 6'2" slender dark-skinned male, dressed in all black, holding a gun, running towards St. Charles Avenue. According to Ms. Benoit, she did not know the man, but was certain he was not Jamiron or Bernell because she has known the Pollards for many years. Ms. Benoit testified that the police were on the scene, but they did not want to talk to anyone. Ms. Benoit acknowledged that she did not contact the police, but stated that she called Crimestoppers.
LAW AND ANALYSIS
The defendants assign as error the following: (1) the trial court’s admission of the hearsay testimony of Sedale Dorsey; (2) the trial court’s refusal to declare a mistrial based on the hearsay testimony of Dorsey; (3) the trial court’s denial of the motion for a new trial because of the hearsay testimony of Dorsey; (4) the trial court’s admission of Sean Briggs’ prior statement because a proper foundation was . not established; (5) the trial court’s admission of Briggs’ statement without proper authentication; (6) the trial court’s admission of the recording of a jailhouse phone call made by Bernell Pollard; .(7) the trial court’s refusal to declare a mistrial because of the admission of the call; (8) the trial court’s denial of the motion for severance on the basis of the call; and (9) the insufficiency of the evidence presented at trial to support their convictions.

Sufficiency of Evidence-Assignment of Error 9

When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Falkins, 12-1654, p. 8 (La.App. 4 Cir. 7/23/14), 146 So.3d 838, 845 (citing State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55). We begin our discussion with a review of all evidence introduced at trial.
pnIn this assignment of error, the defendants narrow their sufficiency claim on the premise that, but for the improperly-admitted hearsay testimony of Sedale Dorsey and Sean Briggs, the State failed to meet its burden of proof beyond a reasonable doubt to garner convictions in this case. It is well-established that in reviewing a sufficiency of the evidence claim, the entirety of the evidence, both admissible and inadmissible, is considered. State v. Ross, 11-1668, p. 3 (La.App. 4 Cir. 6/4/14), 144 So.3d 1118, 1121 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Brown, 08-1434, p. 8 (La.App. 4 Cir. 3/18/09), 7 So.3d 1238, 1242). A discussion *298 on the admissibility of the alleged hearsay testimony of Dorsey, as well as the admissibility of the prior recorded statement of Briggs, is found later in our review of the assignments of error. In compliance with our standard of review for sufficiency of evidence, we consider the statements without comment on their admissibility.
In evaluating whether the evidence is sufficient to support a conviction, appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Ennis, 11-0976, pp. 4-5 (La.App. 4 Cir. 7/5/12), 97 So.3d 575, 579 (quoting State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18). In applying this standard, the appellate court is not to determine whether it “believes the witnesses or whether the conviction is contrary to the weight of the evidence,” but rather it is to consider the record as a whole, and if rational triers of fact could disagree as to the interpretation of the evidence, the conviction should not be disturbed. State v. Peters, 12-1641, p. 16 (La.App. 4 Cir. 8/21/13), 123 So.3d 307, 316 (quoting State v. Taylor, 12-0345, pp. 18-19 (La.App. 4 Cir. 6/26/13), 118 So.3d 65, 77).
The defendants in this case were convicted of the second degree murder of Jeremy Galmon and the attempted second degree murders of Sean Briggs and Sedale Dorsey. The pertinent elements of second degree, murder are the killing of a human being with the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). Likewise, the elements of attempted second degree murder are the specific intent to kill a human being and an overt act taken in furtherance of that goal. La. R.S. 1457(A); La. R.S. 14130.1(A)(1). The law of principals states that all persons who knowingly participate in the planning or execution of the crime, whether present or absent, are equally culpable. State v. Neal, 00-0674, p. 12 (La.6/29/01), 796 So.2d 649, 659 (citations omitted); see La. R.S. 14:24. Thus, in order for both defendants to be found guilty, the State must only prove that each was involved with the commission of the crime. See State v. McCord, 11-0656, pp. 8-9 (La.App. 4 Cir. 2/15/12), 85 So.3d 210, 215.
Specific intent is an essential element of actual and attempted second degree murder. State v. Johnson, 08-1488, pp. 9-10 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 334 (citations omitted). Specific intent is that “state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent can be inferred from the defendant’s acts and circumstances and need not be proven as fact. State v. Buhcannon, 11-1727, p. 11 (La.App. 4 Cir. 3/13/13), 112 So.3d 312, 319 (quoting State v. Pittman, 11-0741, pp. 3-4 (La.App. 4 Cir. 2/29/12), 85 So.3d 782, 785). “The intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries.” State v. Ott, 10-1307, p. 8 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1285 (citing State v. Lawson, 08-0123, p. 7 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522). A-defendant’s act of aiming a lethal weapon and discharging it in the direction of his victims, as in this case, has been found to be evidence of specific intent to kill. State v. Cooks, 11-0342, pp. 16-17 (La.App. 4 Cir. 12/14/11), 81 So.3d 932, 942 (citations omitted).
In the case at bar, Ursula Nicholas testified that she initially heard several *299 gunshots and then observed two men fire at a passing vehicle. Within 24 hours of the incident, Ursula gave a statement to the investigating officers whereby she described one of the shooters as tall and thin with “dreads,” and the second shooter as short. This description of the shooters was consistent with Ashley, Tracy, and Dorimekka Nicholas, all of whom gave statements to the investigating officers either later that evening or the following day. Based upon the statements of witnesses, the officers were able to draft composites of the suspects and develop photographic line-ups with the defendants as suspects. Ursula also selected the defendant that appeared in her photographic line-up, Bernell Pollard.
Furthermore, Sean Briggs and Sedale Dorsey unequivocally identified the defendants as the men who were shooting at them. • Briggs and Dorsey saw the shooters’ faces as numerous shots were fired at the vehicle they were occupying. Dorsey gave the police a statement two days after the shooting and selected the defendants’ photographs in their respective line-ups. Briggs gave a statement identifying the defendants by name approximately one month after the shooting and also made positive identifications of both defendants.[8]
|13We find the State presented sufficient evidence to convince a rational trier of fact that each element of the crimes was proven beyond a reasonable doubt. The defendants are not entitled to relief on this assignment.

Hearsay Testimony of Sedale Dorsey and Motions for Mistrial and New Trial-Assignments of Error 1, 2, and 3

In these assignments, the defendants charge error in the trial court’s admission of the recording of Sedale Dorsey’s prior statement, the transcription of that statement, and the photographic line-ups from which Dorsey identified the defendants as the shooters.[9] The complained of evidence was introduced at trial through the testimony of Det. Long, and the defendants filed motions for mistrial and new trial in response. The trial court denied both motions, and these rulings serve as grounds for two separate assignments of error. The defendants argue that because Dorsey did not testify at trial, the evidence was inadmissible hearsay and their motions should have been granted.
Unless an irregularity or error is objected to at the time of occurrence, it cannot be complained of after verdict. La. C.Cr.P. art. 841. A simultaneous objection is required so that the trial court can rule accordingly and cure or prevent any potential error. Thus, on appeal, the defense is limited to those grounds raised at trial. State v. Keys, 12-1177, p. 13 (La.App. 4 Cir. 9/4/13), 125 So.3d 19, 31 (citing State v. Baker, 582 So.2d 1320, 1336 (La.App. 4th Cir.1991)). A review of the record reveals that no objection was made during direct examination when Det. Long testified to Dorsey identifying both defendants in photographic line-ups.[10] | uTherefore, any alleged error as to Det. Long’s testi *300 mony on direct examination was not preserved for our review.
On cross-examination, the defense questioned Det. Long about the descriptions given by Dorsey and Dorsey’s identification. When the State revisited the issue on redirect, objections were lodged. “Once the defense opens the door in cross examination on a subject it becomes a proper subject for redirect.... The defense may not approach a prohibited area ... and then close the door to clarification by the State.” State v. Hugle, 11-1121, p. 23 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 615 (quoting State v. Steward, 483 So.2d 155, 157 (La.App. 4th Cir.1986)). The record reflects that defense counsel opened the door concerning the contents of Dorsey’s statement and identification; thus, the defense cannot now be heard to complain. Accordingly, there was no error in admitting this testimony.
The defendants aver that the trial court erred in denying their motion for mistrial. “[A] mistrial is a drastic remedy that should only be declared upon a clear showing of prejudice by the defendant[s].” State v. Johnson, 09-0706, p. 22 (La.App. 4 Cir. 5/26/10), 41 So.3d 1188, 1203 (citing State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667). While the “mere possibility of prejudice is insufficient to warrant a mistrial,” a trial court’s ruling will not be disturbed absent an abuse of discretion. Id. (citations omitted).
The defendants further assert that the trial court erred in denying their motion for a new trial. La.C.Cr.P. art. 851(B)(2) provides that the trial court shall grant the defendant’s motion for a new trial when “[t]he court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.” While a motion for a new trial should only be granted when injustice has been done, La.C.Cr.P. art. 851(A), a trial court’s ruling on such a motion is afforded much discretion and our review “is limited to determining whether the trial court 115abused its discretion.” State v. Simmons, 10-1508, pp. 2-3 (La.App. 4 Cir. 2/15/12), 85 So.3d 743, 745 (citations omitted).
In the instant case, this evidence simply corroborated the identifications of Ursula Nicholas and Sean Briggs. Moreover, the statement that Dorsey identified both defendants as the shooters when shown photographic line-ups was elicited by the State during direct examination without objection, and the State was entitled to ask questions regarding Dorsey’s identification on redirect once the defense opened the door on cross-examination. The defendants have failed to prove that the evidence complained of contributed to the jury’s verdict or that the trial court erred by denying their motions based upon this evidence. Thus, these assignments of error are without merit.

Proper Foundation and Authentication for Sean Briggs’ Recorded Statement-Assignments of Error 4 and 5

In these assignments, the defendants argue that the trial court erred in admitting Sean Briggs’ October 28, 2010 recorded statement and the transcription thereof because the State failed to lay the proper foundation for their introduction and they were not properly authenticated. This statement was a result of Briggs contacting Det. Long to request a follow-up meeting. This meeting occurred on October 28, 2010, and was attended by Assistant District Attorney Craig Famularo, Det. Long, Det. McCleery, Briggs, and Briggs’ attorney. The examination was conducted by Mr. Famularo and was recorded and transcribed by a court reporter. The recorded *301 statement and transcript were introduced at trial after Briggs was deemed a hostile witness, in order to impeach his trial testimony.
The defendants first contend that the evidence was improperly admitted because the State failed to establish the proper foundation under La. C.E. art. 613 for an extrinsic attack on credibility. La. C.E. art. 613 provides that prior | ^inconsistent statements are “admissible after the proponent has first fairly directed the witness’ attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.” The proper foundation for the admission of such a statement “requires that the time, place and circumstances in which the statement was made be called to the witness’s attention and that the witness be given opportunity to admit or deny having" made the prior statement.” State v. Laymon, 97-1520, (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, 1178. “The witness’s denial of making the prior statement completes the foundation.” Id. (citing State v. Nedd, 93-1906, p. 7 (La.App. 1 Cir. 11/10/94), 647 So.2d 346, 350).
In drawing Briggs’ attention to his October 28, 2010 statement, wherein he identified the shooters as Jamiron and Bernell Pollard, the prosecutor asked Briggs whether he made a formal statement, made the statement voluntarily, described the shooting that occurred on September 26, 2010, recognized his voice on the recording of his statement, had been shown and identified the defendants in photographic line-ups, and was accompanied by an attorney at the time he gave the statement. In response to each question, Briggs either stated he did not know the answer, denied the facts, and/or indicated that he would not comment. Under these circumstances, it cannot be said that the State failed to establish the proper foundation for this evidence under La. C.E. art. 613.
The defendants also aver the evidence was not properly authenticated as required by La. C.E. art. 901. Evidence must either be authenticated as provided in La. C.E. art. 901, or must be self-.authenticating. See La. C.E. art. 902. La. C.E. art. 901(A) states that “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” One method of | ^authenticating evidence is testimony by a witness with knowledge that the “matter is what it is claimed to be.” La. C.E. art. 901(B)(1). “A trial court has great discretion in determining whether a sufficient foundation has been laid for the introduction of evidence.” State v. Ashford, 03-1691, p. 14 (La.App. 4 Cir. 6/16/04), 878 So.2d 798, 806 (citing State v. Lewis, 97-2854, p. 31 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1022).
Briggs’ prior statement was authenticated , by Det. Long who testified that he was present when Briggs made the statement. Moreover, the transcript of Briggs’ statement was produced by Maurice W. Bettencourtt, a certified court reporter. La. C.E. art. 902(1) provides that domestic public documents under seal, such as this transcript, are self-authenticating. Thus, there is no support in the record for this assignment as the trial court did not abuse its discretion in admitting this evidence.
Evidence that is both properly introduced and authenticated can be admitted as non-hearsay, substantive evidence. La. C.E. art. 801(D)(1) provides that a prior statement by a witness is not hearsay if the “declarant testifies at the *302 trial or hearing and is subject to cross-examination concerning the statement. ...” Furthermore, pursuant to La. C.E. art. 801(D)(1)(a), the statement must be “inconsistent with his testimony, provided that the proponent has first fairly directed the witness’ attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.” As previously noted, the prosecutor drew Briggs’ attention to his prior inconsistent statement and gave him an opportunity to acknowledge or deny its existence. For the same reasons that the evidence satisfied the standard of La. C.E. art. 613, the State met the mandates of La. C.E. art. 801(D)(1)(a) and the statement was properly admitted as substantive, non-hearsay evidence.
|1BA proper foundation was established for the admission of the October 28, 2010 recorded statement and transcript, and they were both properly authenticated and offered as substantive, non-hearsay evidence. Accordingly, we find no error in the admission of this evidence.

Admissibility of Jailhouse Call and Motions for Mistrial and Severance-Assignments of Error 6, 7, and 8

In these assignments, the defendants charge error in the admission of the recording of Bernell Pollard’s jailhouse telephone call and in the denial of the motions for mistrial and severance[11] on the basis of that admission.
The defendants contend that the jailhouse call was improperly admitted[12] because it was “highly prejudicial,” considering its “racial slurs,” “offensive language,” and “inflammatory remarks.” The defendants also claim that the call is “irrelevant ... [and] has nothing to do with Jamiron Pollard.” In response to the defendants’ relevancy objection to the recording being played for the jury, the prosecutor argued:
... obviously this call is relevant because it’s talking about this trial and it’s up to the jury to make the determination as to the weight that'they are going to give it; however, it cannot be said that it’s not relevant when [Bernell] specifically mentions testimony that happened] in this court yesterday from Shawn [sic] Briggs and the ladies who took the stand yesterday as the State’s witnesses. So for that reason ... the State does believe that it is relevant. The fact that he may use inflammatory language; I’m not exactly sure what [defense counsel] is referring to. Again ... that’s for the jury to make a determination as to what they will about whatever language, whatever words he chooses to use.
|1flDefense counsel then responded to the foregoing by stating that the recording was inadmissible because the call refers to an unrelated case on the news.[13]
Unless the trial court clearly abuses its discretion, its ruling on the admissibility and relevancy of evidence will not be disturbed. State v. Greenberry, 14-0335, p. 13 (La.App. 4 Cir. 11/19/14), 154 So.3d 700, 708 (quoting State v. Cyrus, 11-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565); State v. White, 09-0025, p. 9 *303 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204 (quoting State v. Hall, 02-1098, p. 8 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 496). “[A] trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” Greenberry, 14-0335, pp. 13-14, 154 So.3d at 708 (quoting White, 09-0025, p. 9, 22 So.3d at 204).
The defendants have not shown that the jailhouse call is inadmissible, nor have they proven any prejudice by its admission into evidence. Thus, the defendants’ failure to present corroborating evidence to support their position makes this argument unavailing. As this issue is determined herein non-favorably to the defendants, there is no proof that Jamiron’s motion for mistrial was erroneously denied. The merits to the denial of Jami-ron’s motion for severance, however, must be examined.
Severances are generally governed by La.C.Cr.P. arts. 704 and 705. “A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state.” State v. Everett, 11-0714, p. 33 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 629 (citing State v. Prudholm, 446 So.2d 729, 741 (La.1984)). The decision of whether a |2nseverance shall be granted is within the sound discretion of the trial court, which will not be disturbed unless that discretion was abused. Id. (citing Prudholm, 446 So.2d at 741). “Where the thrust of the co-defendant’s testimony is simply to deny his own involvement and not implicate the other defendant, justice does not require a severance; this rule applies even though the co-defendant’s testimony may, by inference, be damaging to the other defendant.” State v. Krodinger, 12-0134, p. 12 (La.App. 4 Cir. 2/27/13), 128 So.3d 270, 278 (citing State v. Brown, 527 So.2d 12, 14 (La.App. 3d Cir.1988)).
Jamiron’s motion for severance maintains that he had no part in the call, yet was “saddled, burdened and prejudiced” by Bernell’s statements. In response to Jamiron’s motion, the prosecutor emphasized that the jailhouse call did not mention “anything as it relates to Jamiron Pollard’s activity or failure to act.” Further, the prosecutor argued that a severance is not warranted because the jury can surmise that Bernell made the call and did not implicate Jamiron. In denying the motion, the judge stated that defense counsel can argue to the jury the effect and weight, if any, that the recording should be given. Considering that the defendants denied culpability, neither blamed the other for the crimes, and their defenses were not antagonistic, the jailhouse call did not impact Jamiron and the trial judge did not abuse her discretion in denying the motion for severance.
The assignments pertaining to the admission of the recording of the jailhouse call and the motions for mistrial and severance based on that admission are without merit.
ERRORS PATENT
A review of the record for errors patent reveals four.
The first two errors pertain to the trial court sentencing the defendants on the day that their motions for a new trial were denied. La.C.Cr.P. art. 873 states thatj^when a motion for a new trial is filed, “sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be *304 imposed immediately.” A defendant can also waive the twenty-four hour delay implicitly by announcing his readiness for sentencing. State v. Foster, 02-0910, p. 2 (La.App. 4 Cir. 12/11/02), 834 So.2d 1188, 1191; State v. Pieire, 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903. Nevertheless, the failure to observe this delay is harmless when the defendant does not complain of his sentence on appeal or when the sentence imposed is mandatory. State v. Green, 10-1355, p. 12 (La.App. 4 Cir. 6/22/11), 69 So.3d 695, 703; State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380.
Here,- when the trial judge asked “[i]s the Defendant prepared for sentencing,” Jamiron Pollard responded in the affirmative. Thus, Jamiron implicitly waived any delay by announcing his readiness for sentencing. There is no indication in the record that Bernell Pollard expressly or implicitly waived the twenty-four hour delay; however, Bernell has not assigned error as to his sentence on appeal and his sentence of life imprisonment without benefits under La. R.S. 14:30.1(B) is mandatory. Accordingly, with respect to both defendants, these errors, if any, are harmless, and this Court need not take any remedial action in this regard.
The third and fourth errors patent concern the legality of the $276.50 fine imposed in conjunction with the defendants’ second degree murder sentences. Under La. R.S. 14:30.1(B), the penalty for this offense is “life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.” There is no statutory authority for the imposition of a fine; thus, the $276.50 fine is illegal. An appellate court is authorized to correct an illegal sentence even if thej^issue is not raised by either party. La.C.Cr.P. art. 882(A). Therefore, we amend the defendants’ second degree murder sentences to delete the $276.50 fíne. The case is remanded to the trial court to correct the sentencing minutes and the order of commitment to reflect that the fines have been vacated.
DECREE
For the foregoing reasons, the defendants’ convictions are affirmed. The defendants’ sentences for second degree murder are amended to delete the $276.50 fine. The case is remanded and the trial court is instructed to note the amendment in the sentencing minutes and the order of commitment. The defendants’ sentences are affirmed in all other respects.
AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.

. Jamiron and Bernell Pollard are brothers.

. Sean Briggs testified on behalf of the State pursuant to an immunity agreement wherein the State agreed not to prosecute Briggs for being a felon in possession of a firearm in exchange for his truthful testimony at this trial.

. Sedale Dorsey was deceased at the time of trial.

. In the statement, Dorsey states that he and Sean Briggs were in the Chevrolet Impala that the defendants were shooting at on September 26, 2010. The statement provides in part:
Once we approached ... Dryades, I see Jamiron ... up his gun and ... tell Be[rnell] ... "that’s the car right there.” So, as we goin[g] ... across First, they start shootin[g] ... Sean ... tried to pull off. But the car in front [of] us slammed on [its] brakes. That’s how they really shot [Sean’s] car up ... I saw the [shooters'] faces....

. On cross examination, it was discovered that the database search actually revealed that Bernell was the occupant of a similar vehicle, not a Chevrolet Impala.

. Bernell's hair was shaved when he was arrested. However, Det. Long testified that he learned from Quario Keller, the mother of Bernell's child, that Bernell had "short twists or short dreadlocks” on the day of the shooting.

.In the statement, Briggs stated that he and Sedale Dorsey were riding in Briggs’ vehicle on the day of the shooting; as they arrived at the intersection of Dryades and First Streets, Dorsey shouted, "watch your mama” and "you need to draw a gun;” and that he saw both Jamiron and Bernell shooting.

. Although at trial Briggs recanted his prior statement, it was well within the jury’s province to believe Briggs' prior statement over that of Briggs’ trial testimony.

. These exhibits were admitted for record purposes only and were not published to the jury.

. While the defense raised a hearsay objection when Det. Long was reviewing Dorsey's photographic line-up, it was withdrawn after a brief bench conference. A withdrawn objection is treated as if no objection was raised and does not preserve the issue for appellate review. State v. Smith, 98-1417 (La.6/29/01), 793 So.2d 1199, 1214 (citations omitted); State v. Bias, 95-541, p. 3 (La.App. 3 Cir. 1/31/96), 674 So.2d 265, 267.

. Both defendants objected to the admission of the recording of the jailhouse call; however, only Jamiron Pollard moved for a mistrial and severance.

.Donald Hancock, the records custodian for reéordings of jailhouse telephone calls, identified and authenticated the detail log and recording of a call made by Bernell Pollard on August 29, 2013.

.It should be noted that the trial judge admonished the jurors from watching the news during trial.